ACCEPTED
03-15-00100-CV
5331285
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/18/2015 6:29:24 PM
JEFFREY D. KYLE
CLERK

**NO. 03-15-00100-CV**

# IN THE COURT OF APPEALS
## FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
## AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/18/2015 6:29:24 PM
JEFFREY D. KYLE
Clerk

**IN RE THE ESTATE OF EDELL WADE, DECEASED.**

**JAMES E. WADE,**
*Appellant*,
**v.**
**JOHNNY WADE AND AMANDA WADE, INDIVIDUALLY AND AMANDA WADE AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF EDELL WADE,**
*Appellees.*

**Appealed from the County Court at Law of Burnet County, Texas**

## APPELLANT'S BRIEF

RICHIE & GUERINGER, P.C.
SHELDON E. RICHIE
State Bar No. 16877000
EMILY J. SEIKEL
State Bar No. 24072331
100 Congress Avenue, Suite 1750
Austin, Texas 78701
512-236-9220 telephone
512-236-9230 facsimile
srichie@rg-austin.com Email
eseikel@rg-austin.com Email
ATTORNEYS FOR JAMES E. WADE

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), the following is a complete list of all parties, and the names and addresses of all counsel, involved in this case:

*Appellant:*

James E. Wade

*Counsel for Appellant:*

Sheldon E. Richie
State Bar No. 16877000
Emily J. Seikel
State Bar No. 24072331
Richie & Gueringer, P.C.
100 Congress Avenue, Suite 1750
Austin, Texas 78701
512-236-9220 Telephone
512-236-9230 Facsimile
srichie@rg-austin.com Email
eseikel@rg-austin.com Email

*Appellees:*

Johnny Wade
Amanda Wade, Individually and as the Independent Executor of the Estate of Edell Wade

*Counsel for Appellees:*

*For Johnny Wade and Amanda Wade Individually*
Kathryn E. Allen
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2200
Austin, Texas 78701
512-480-5651 Telephone
512-480-5851 Facsimile
kallen@gdhm.com Email

*For Amanda Wade as Independent Executor*
Claude E. Ducloux
Hill, Ducloux, Carnes & De La Garza
400 West 15th Street, Suite 808
Austin, Texas 78701
512-474-7054 Telephone
512-474-5605 Facsimile
cducloux@hdcdlaw.com Email

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL........................................................2

TABLE OF CONTENTS ..............................................................................4

INDEX OF AUTHORITIES..........................................................................5

STATEMENT OF THE CASE........................................................................7

REQUEST FOR ORAL ARGUMENT..............................................................9

ISSUES PRESENTED FOR RELIEF ............................................................10

STATEMENT OF FACTS...........................................................................11

SUMMARY OF THE ARGUMENT ..............................................................24

ARGUMENT..........................................................................................28

    Issue 1: The Trial Court erred when it granted Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims), as modified and entered by the Trial Court on the 11th day of April, 2014.................................................28

    Issue 2: The Trial Court erred when it approved of the jury's findings in response to Jury Question No. 1 and Jury Question No. 2 finding that Johnny and Amanda Wade complied with their fiduciary duties to Edell Wade in connection with the Modification Agreement. ...............................................................44

PRAYER...............................................................................................61

CERTIFICATE OF COMPLIANCE ..............................................................62

CERTIFICATE OF SERVICE .....................................................................63

APPENDIX............................................................................................64

# INDEX OF AUTHORITIES

**Cases**

*Boucher v. Wallis*, 236 S.W.2d 519 (Tex.Civ.App.—Eastland 1951) ............. 32, 33

*Chapal v. Vela*, 461 S.W.2d 466 (Tex.Civ.App.—Corpus Christi 1970) .. 36, 39, 41

*City of Houston v. Trail Enterprises, Inc.*, 300 S.W.3d 736 (Tex. 2009)................29

*Cobb v. TDCJ*, 965 S.W.2d 59 (Tex.App.―Houston 1st Dist.] 1998, no writ)......29

*Collins v. Smith*, 53 S.W.3d 832 (Tex.App.—Houston [1st Dist.] 2001, no pet.) ..46

*D.T. Carroll Corp. v. Carroll*, 256 S.W.2d 429 (Tex.Civ.App.—San Antonio 1953) ...............................................................................................................33

*De Toca v. Wise*, 748 S.W.2d 449 (Tex. 1998) ......................................................32

*ECC Parkway Joint Venture v. Baldwin*, 765 S.W.2d 504 (Tex.App.—Dallas 1989) ...............................................................................................................32

*Estate of Townes v. Townes*, 867 S.W.2d 414 (Tex.App.—Houston [14th Dist.] 1993, writ denied)..........................................................................................59

*Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41 (Tex. 1965) ...................................................................................................28

*HCBeck, Ltd. v. Rice*, 284 S.W.3d 349 (Tex. 2009).................................................29

*HECI Exploration Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998) .................................34

*In re Estate of Fawcett*, 55 S.W.3d 214 (Tex.Civ.App.—Eastland 2001) ....... 42, 43

*In re Estate of Herring*, 970 S.W.2d 583 (Tex.App.—Corpus Christi 1998, no pet.) .....................................................................................................................30

*In re Estate of Miller*, 2014 WL 3970766, 446 S.W.3d 445 (Tex.App.—Tyler, Aug. 13, 2014) ...............................................................................................47

*In re Guardianship Walzel*, 2010 WL 335686 (Tex.App.—Corpus Christi-Edinburg, Jan. 28, 2010)..................................................................................47

*Jennings v. Burgess*, 917 S.W.2d 790 (Tex. 1996)..................................................29

*Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150 (Tex. 2004) ......................28

*Jordan v. Lyles*, 455 S.W.3d 785 (Tex.App.—Tyler 2015) ....................... 48, 49, 59

*Kansa Reinsurance Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362 (5th Cir. 1994) ....................................................................................................... 32, 33

*Limestone Prods. Distrib., Inc. v. McNamara,* 71 S.W.3d 308 (Tex. 2002)...........31

*Matter of Estate of Matejek*, 928 S.W.2d 742 (Tex.App.―Corpus Christi, 1996)...., 30, 31, 37, 38, 42

*Merriman v. XTO Energy, Inc.,* 407 S.W.3d 244 (Tex. 2013) .................................29

*Minn. Mining & Mfg. Co. v. Nishika, Ltd.,* 953 S.W.2d 733 (Tex. 1997)...............45

*Montgomery v. Kennedy*, 669 S.W.2d 309 (Tex. 1984) ..........................................28

*Mooney v. Harlin*, 622 S.W.2d 83 (Tex. 1981) .............................................. 36, 42

*Munawar v. Cadle Co.,* 2 S.W.3d 12 (Tex.App.—Corpus Christi 1990) ...............34

*Plas-Tex, Inc. v .U.S. Steel Corp.*, 772 S.W.2d 442 (Tex. 1989.) ..........................45

*Porter v. Denas*, 2006 WL 1686515, \*4 (Tex.App.―San Antonio, June 21, 2006, pet. denied) ...................................................................................... 45, 49

*Rentfro v. Cavazos IV*, 2012 WL 566364 (Tex.App.―San Antonio, September 21, 2012) ...............................................................................................41

*Rhone v. Steel*, 997 S.W.2d 217 (Tex. 1999)........................................................30

*Stephen County Museum, Inc. v. Swenson*, 571 S.W.2d 257 (Tex. 1974)...............49

*Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex. 1980) ................. 46, 50

*Thomson Oil Royalty, LLC v. Graham,* 351 S.W.3d 162 (Tex.App.—Tyler 2011, no pet.) ...............................................................................................28

*Veltmann v. Damon,* 696 S.W.2d 241 (Tex.App.—San Antonio 1985) .................40

*Vogt v. Warnock*, 107 S.W.3d 778, 783-784 (Tex.App.—El Paso 2003, pet. denied) ...................................................................................... 47, 48, 49, 50, 59

*Zale Corporation v. Rosenbaum*, 520 S.W.2d 889 (Tex. 1975).............................29

**Statutes**
TEX. ESTATES CODE § 752.051.......................................................................48

## STATEMENT OF THE CASE

*Nature of the underlying proceeding:*

On behalf of the Estate of Edell Wade, Plaintiff brought action for claims for breach of fiduciary duty, tortious interference with inheritance rights, fraud, conspiracy, reformation, rescission, judicial foreclosure, constructive trust, defalcation, unjust enrichment, profit disgorgement and removal of executor.[1]

*Course of the Proceedings:*

Summary Judgment Motion Hearing held on April 11, 2014.[2]

Jury trial from September 29, 2014 until October 6, 2014.[3]

*Trial Court's Disposition of Case:*

Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims), as modified and entered on April 11, 2014.[4]

Order Denying Plaintiff's Emergency Motion to Reconsider the Court's Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale or, Alternatively, to Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission to Appeal Interlocutory Order, entered on April 29, 2014.[5]

---

[1]    CR:    765-819.
[2]    RR:    Vol. 2 of 4.
[3]    CR:    1599-1601.
[4]    CR:    611.
[5]    CR:    762.

Final Judgment in favor of Appellees based on the Jury Verdict, as modified and entered on November 17, 2014.[6]

Order Denying Plaintiff's Motion for Judgment Notwithstanding the Verdict, as modified and entered on November 17, 2014.[7]

Order Denying Plaintiff's Motion for New Trial, entered on January 26, 2015.[8]

---

[6]   CR:   1599-1601.
[7]   CR:   1602.
[8]   CR:   1633.

## REQUEST FOR ORAL ARGUMENT

Appellant James E. Wade requests the opportunity to present oral argument in this proceeding. Oral argument will assist with clarification of the legal arguments in this appeal, including the applicability of and distinctions of legal precedent cited to herein. Oral argument will also be helpful in the decisional process of the Court to the extent that facts and evidence are unclear to the Court or are disputed between the parties. This appeal is not frivolous and the Trial Court misapplied the law when it granted Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale. Plaintiff seeks an opportunity to more fully clarify, through oral argument, the bases for overturning the summary judgment, as well as for rebutting anticipated differences between the parties regarding the appellate record, the evidence presented at trial, and the propriety of the Trial Court's affirmation of the jury's findings in response to Jury Question No. 1 and Jury Question No. 2.

# ISSUES PRESENTED FOR RELIEF

## Issue One

The Trial Court erred when it granted Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims), as modified and entered by the trial court on the 11th day of April, 2014.

## Issue Two

The Trial Court erred when it approved of the jury's findings in response to Jury Question No. 1 and Jury Question No. 2 finding that Johnny and Amanda Wade complied with their fiduciary duties to Edell Wade in connection with the Modification Agreement.

## STATEMENT OF FACTS

In August of 2012, James "Bud" Wade brought this suit on behalf of the Estate of his mother, Edell Wade, against his sibling Johnny Wade as well as Johnny's wife Amanda Wade, whom he sued individually as well as in her capacity as independent executor of the Estate of Edell Wade. Bud seeks to recover value and property to the Estate that has been lost over the years due to actions of Johnny and Amanda Wade, beginning in 2004 when Johnny and Amanda induced Edell Wade to sell her 475-acre Texas ranch to them, and continuing through the years leading up to and after the death of Edell Wade in 2010.

Bud Wade is the oldest of seven children of Edell Wade and Otto Wade.[9] Johnny Wade is the youngest.[10] The Wade family grew up on a 475-acre ranch located near Lampasas in Burnet County, Texas (the "Ranch").[11] After growing up and moving out of the family home, only three of the siblings – Bud, Nancy and Charlene – chose to live close enough to their parents to visit regularly and to provide assistance with chores, farm repairs, doctor visits and other appointments.[12] Edell's husband Otto passed away in 1996 and Edell continued to

---

[9]     CR:     [James "Bud" Wade Affidavit] at 477 par. 2; 478 par. 7.
[10]    CR:     [James "Bud" Wade Affidavit] at 478 par. 7.
[11]    CR:     [Nancy Burns Affidavit] at 473 par. 2.
[12]    CR:     [Nancy Burns Affidavit] at 473 par. 3; [James "Bud" Wade Affidavit] 477 at par. 4.

live on the Ranch alone, with her children Bud and Nancy living only a short drive away.[13]

In 2003, Johnny Wade decided to move back from California to Lampasas after over fifteen years living away from Lampas.[14] Johnny and his wife Amanda, who was a California lawyer with experience in estate planning, met with Edell Wade in December 2003 and introduced their idea to move back to Texas and to buy the Ranch.[15] As testified to by Johnny, Edell initially did not want to sell the Ranch.[16] But, as Amanda testified, Johnny and Amanda told Edell that the only circumstance under which they would move back to Texas would be if she sold the Ranch to them.[17]

At the time, Edell was an 89-year old woman living on the Ranch, the place she loved most in the world.[18] She was still very active in her church and the community.[19] Edell had children living nearby who could and did provide care and companionship, and who had been living close to her for over 40 years.[20] She was mentally and physically healthy enough to manage her affairs and did not need

---

[13] CR:    [Nancy Burns Affidavit] at 474 par. 4; [James "Bud" Wade Affidavit] 477 at par. 4.
[14] CR:    [James "Bud" Wade Affidavit] 477 at par. 8.
[15] CR:    [Amanda Wade Deposition] 401-402, 405, 406, 409,412; [Johnny Wade Deposition] 430.
[16] CR:    [Johnny Wade Deposition] 430.
[17] CR:    [Amanda Wade Deposition] 406,412.
[18] CR:    [Nancy Burns Affidavit] at 474 par. 7; [James "Bud" Wade Affidavit] at 478 par. 5.
[19] Id.
[20] Id.

live-in help or anyone to make her business and medical decisions for her.[21] Johnny Wade testified that Edell was "capable of being on her own and wanted to be on her own."[22] In fact, Edell did not need assistance with her affairs until the last year of her life (i.e., 2009-2010), as testified to by Amanda.[23]

Johnny and Amanda convinced Edell to sell the Ranch to them and, on or about January 6, 2004, Johnny Wade, Amanda Wade, and Edell Wade met with Pat Cavness, a local attorney who had served as Edell Wade's attorney over the years, to discuss the sale of the Ranch.[24] Edell and her deceased husband had a long-standing relationship with Mr. Cavness, who had worked over the years with the couple to prepare their wills.[25] Mr. Cavness recommended "a regular interest rate."[26] The prime rate of interest at that time was 4.25%.[27] However, at the meeting, a 2% interest rate was provided.[28] Mr. Cavness drafted the initial documents for the sale and on January 16, 2004, he sent drafts of the Warranty Deed with Vendor's Lien, Promissory Note, Deed of Trust, Closing Agreement, and Settlement Statement to Johnny and Amanda for their review; however those

---

[21]    Id.
[22]    CR:    [Johnny Wade Deposition] 436.
[23]    RR:    [Amanda Wade Deposition] 409,413.
[24]    CR:    [Pat Cavness File] 347.
[25]    CR:    [Pat Cavness File] 382, 383; [Amanda Wade Deposition] 407-408.
[26]    CR:    [Amanda Wade Deposition] 407.
[27]    *See* http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.
[28]    CR:    [Pat Cavness File] 347.

documents were never signed.[29]  Mr. Cavness also drafted a non-representation letter to advise Johnny and Amanda that he represented Edell's interests, and not theirs.[30]  On January 23, 2004, Amanda returned the drafts of the documents that Edell's attorney had created, with many handwritten changes that were favorable to Johnny and Amanda (including a reduced default interest rate from 18% to 12%), and directed Mr. Cavness to revise the documents per her instruction.[31]  Mr. Cavness rejected Amanda's changes on behalf of his client Edell.[32]  Amanda testified "I didn't want to continue using him" and fired Mr. Cavness.[33]  No attorney was again involved to represent Edell's individual interests in the sale of the Ranch.  The Ranch was the single most significant asset that Edell Wade possessed.[34]

After firing Edell's longtime attorney, Defendants retained their own legal counsel selected by Amanda – attorneys with the law firm of Armbrust & Brown LLP, located miles away in Austin, Texas – to incorporate Amanda's desired contract language to the documents.[35]  Johnny and Amanda paid for those legal services.[36]  There is no evidence that the Armbrust & Brown lawyers ever met with

---

[29]    CR:    [Pat Cavness File] 349- 362;[Amanda Wade Deposition] 407-408.
[30]    CR:    [Pat Cavness File] 363.
[31]    CR:    [Pat Cavness File] 364-380.
[32]    CR:    [Pat Cavness File] 364.
[33]    CR:    [Amanda Wade Deposition] 407.
[34]    CR:    [Inventory and Appraisement] 336-337.
[35]    CR:    [Amanda Wade Deposition] 407-408; [Johnny Wade Deposition] 431.
[36]    CR:    [Amanda Wade Deposition] 408.

or spoke to Edell. Edell Wade was not represented by an attorney in the sale of the Ranch, the most valuable property that she owned.[37]

The Armbrust version of the sale documents were drafted at the sole direction of Amanda and were identical to the version that she (a licensed attorney at the time) had tried in vain to push through with Edell's lawyer Mr. Cavness but were rejected by Mr. Cavness on behalf of Edell before Amanda fired him.[38] On February 6, 2004, the Deed of Trust, Warranty Deed with Vendor's Lien (hereinafter "Warranty Deed"), and Promissory Note (the "Note") (collectively the three documents are the "Sale Documents") prepared by the Armbrust & Brown attorneys and including the changes proposed by Amanda, were executed.[39] On March 3, 2004, the Deed of Trust and the Warranty Deed were filed of record in the Official Public Records of Burnet County, Texas.[40] The purchase price and other terms of the sale (such as the interest rate) are not discernible from those documents filed in public records.[41]

As evidenced by the Note, the sale was owner-financed by Edell Wade.[42] The terms of the Note required Johnny and Amanda to pay Edell $500,000 over a

---

[37]    CR:    [Inventory and Appraisement] 336-337.
[38]    CR:    [Deed of Trust] 321-335; [Pat Cavness File] 349- 362; [Johnny Wade Deposition] 431.
[39]    CR:    [Deed of Trust] 321-335; [Warranty Deed with Vendor's Lien] 463-472.
[40]    CR:    [Deed of Trust] 321-335; [Warranty Deed with Vendor's Lien] 463-472.
[41]    Id.
[42]    CR:    [Promissory Note] 544-546.

period of 32 years at an annual interest rate of two percent (2%).[43] The Note, made when Edell Wade was 89 years old, was due to mature in 2036, or when and if, Mrs. Wade lived to be 121 years old.[44] Only the monthly interest payment was required for the first two years (i.e. approximately $10,000/year or $833/month) (a provision added by Johnny and Amanda's attorneys).[45] Then, beginning February 1, 2006, Johnny and Amanda would be required to pay a combined principal and interest amount of $1,848.10.[46]

The Closing Agreement, which was signed by Edell, Johnny and Amanda Wade states that $150,000 of the $500,000 purchase price was paid for "one acre of land and the small frame house."[47] Pat Cavness' notes from the initial meeting about the sale also indicate that $150,000 was for the house, and $350,000 was allocated to the balance.[48] As such, the remaining 474 acres of the Ranch property were sold for $350,000, a small fraction of its fair market value. The actual value of the Ranch in 2004 was more than $350,000 and more than $500,000, and one appraiser has approximated its 2004 value at $835,000.[49] The value at the time of Edell's death and the administration of the Estate, and today, would be significantly higher.

---

[43]    Id.
[44]    Id.
[45]    Id.
[46]    Id.
[47]    CR:    [Closing Agreement] 591.
[48]    CR:    [Pat Cavness File] 347.
[49]    CR:    [Summary Appraisal] 481-543.

In 2005, after the sale, Johnny and Amanda left California and moved onto the Ranch with Edell Wade.[50] There was no expectation from the other siblings that wrongdoing would occur or that Johnny and Amanda would take advantage of or unduly influence Edell Wade.[51] However, over the years, Bud, his wife Gwen and sister Nancy did begin to feel unwelcome during their visits to Edell on the Ranch, and no longer could freely access the Ranch after it became Johnny and Amanda's property.[52] It also became evident that Johnny and Amanda, over time, tightened their level of control over Edell Wade's access to the outside world, activities, and personal affairs.[53]

On or about March 21, 2007, Edell Wade executed a Statutory Durable Power of Attorney appointing Amanda Wade as her attorney-in-fact with a "broad and sweeping" general power of attorney, with no exclusions or exemptions.[54] Amanda consented to and accepted the Power of Attorney and was aware that she held the power of attorney.[55] Neither Bud Wade nor his sister Nancy (who had previously held a power of attorney for her mother since 1993), were advised by Johnny and Amanda of the change in the power of attorney and the appointment of

---

[50]   CR:   [James "Bud" Wade Affidavit] 477 par. 3; [Nancy Burns Affidavit] 474 par. 7.
[51]   CR:   [James "Bud" Wade Affidavit] 478 par. 7, par. 8, 479 par. 12; [Nancy Burns Affidavit] 474 par. 7, 475 par. 11.
[52]   CR:   [James "Bud" Wade Affidavit] 478 par. 9, 479 par. 10, par. 11, par 12; [Nancy Burns Affidavit] 474 par. 8, 475 par. 9, par. 10.
[53]   Id.
[54]   RR:   Vol. 3 of 4 at 4-5 [Statutory Durable Power of Attorney].
[55]   CR:   [Amanda Wade Deposition] 410.

Edell's daughter-in-law Amanda Wade as attorney-in-fact instead of her daughter, Nancy Burns.[56]

In 2009, while Amanda Wade still had the power-of-attorney, a Modification Agreement was executed that modified the terms of the Note. Johnny and Amanda retained Michael Martin of the law firm of Martin, Millican, Henderson & Shrum ("Martin & Millican" herein) – a firm they'd already been using for other legal needs – to prepare the Modification Agreement.[57] The Martin & Millican file on the Modification Agreement identifies the client in the matter as "Johnny Wade et ux."[58] The Martin & Millican file contains a work order that logged the date and line items of work done on the Modification Agreement.[59] The name "Edell Wade" does not appear anywhere in the work order, but Johnny and Amanda's names do.[60] The file also contains a copy of a June 15, 2009, invoice for balance due of $299.30 to "Mr. & Ms. Johnny Wade" for "modification of note"; the invoice does not contain the name "Edell Wade" in the description of services rendered, as a client, nor as a recipient of the bill.[61] The file also contains a copy of a June 15, 2009, letter to Johnny and Amanda Wade stating "Enclosed

---

[56]    CR:    [James "Bud" Wade Affidavit] 479 par. 12; [Nancy Burns Affidavit] 474 par. 6, par. 8, 485 par. 9.

[57]    CR:    [Amanda Wade Deposition] 410; RR Vol. 3 of 4 at 6-13 [Modification Agreement]; RR Vol. 3 of 4 at 14-85 [Martin & Millican File].

[58]    RR:    Vol. 3 of 4 at 14, 15 [Martin & Millican File].

[59]    RR:    Vol. 3 of 4 at 15 [Martin & Millican File].

[60]    Id.

[61]    RR:    Vol. 3 of 4 at 19 [Martin & Millican File].

are a copy of recorded Modification Agreement, the original of which has been sent to Edell Wade and your file regarding the matter which you left with us. Also enclosed is a bill for services."[62]

The <u>only</u> evidence of communication between Michael Martin or anyone at the firm and Edell Wade regarding the Modification Agreement is dated <u>after</u> the execution of the Modification Agreement, and is a two-line correspondence to Edell dated June 15, 2009, that states "Enclosed is original recorded Modification Agreement for your files. A copy has been sent to Johnny and Amanda Wade."[63] In contrast, the file does contain an account statement to Edell Wade for legal work on her will in 2007, and which had a different file number.[64]

The Martin & Millican file logs that on April 15, 2009, an office conference with the "client" (i.e., Johnny and Amanda) was held regarding the desire "to drop note to 0% or take ¼ off principal balance."[65] Michael Martin did in fact prepare the Modification Agreement, and, inconsistent with the initial intake notation that the intent was to <u>either</u> drop the rate to 0% or reduce the principal balance, the Modification Agreement that was ultimately signed by Edell Wade served to **both**

---

| | | |
|---|---|---|
| 62 | RR: | Vol. 3 of 4 at 21 [Martin & Millican File]. |
| 63 | RR: | Vol. 3 of 4 at 20 [Martin & Millican File]. |
| 64 | RR: | Vol. 3 of 4 at 47 [Martin & Millican File]. |
| 65 | Id. | |

materially reduce the principal balance and eliminate the interest rate.[66] In a letter

to Johnny Wade dated May 26, 2009, Michael Martin wrote:

> "Dear Johnny:
> Enclosed you will find the Modification Agreement on the note to your mother in which we have inserted the balance of $227,528.00, reduced the interest rate to zero, and made the monthly payment $1,200 per Amanda's phone call of the 28th. If this is satisfactory, each of you should sign as your names are typed, have notarized, and return for recording with the Burnet County Clerk. If you would like us to notarize, each/all of you can come by with the Modification and sign here. Also enclosed is an amortization schedule on the modified note. If you have any additional changes, please let me now.
> Thank you.
>
> Sincerely yours,
> Michael M. Martin."[67]

The Modification Agreement reduced the interest rate from 2% to 0% and, thus, the monthly payment from $1,849 to $1,200.[68] The principal was further reduced to $227,528, which is a reduction in the amount of at least $40,000 from the true amount owed on the Note at the time.[69] The Modification Agreement resulted in lower monthly payments as well as a lower balance due on the principal.

---

[66]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement].
[67]    RR:    Vol. 3 of 4 at 24 [Martin & Millican File].
[68]    CR:    [Amanda Wade Deposition] 414;
[69]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement]; Vol. 4 of 4 at 3 [Defendants' payment chart]; Vol. 3 of 4 at 3 [Lori Graham's amortization schedule].

However, the face of the Modification Agreement **does not say anything regarding a reduction in principal**, and actually states, in bold-face capital letters on the first page, that its purpose was **exclusively** for the elimination of interest:

**\*THE PARTIES STATE HEREBY THAT THIS MODIFICATION IS FOR THE SOLE PURPOSE OF ELIMINATING THE OBLIGATION OF OBLIGOR TO PAY TO HOLDER INTEREST ON THIS LOAN.\*[70]**

Edell Wade signed the Modification Agreement.[71]  On June 9, 2009, the Modification Agreement was filed in the Official Public Records of Burnet County, Texas.[72]

In 2010, Amanda Wade sent a handwritten note to Lori Graham, Edell Wade's accountant, in connection with preparation of Edell Wade's 2009 tax return.  In that handwritten note, which was stuck to a page of the amortization schedule on the Note, Amanda Wade stated:

> "Lori – We paid Mrs. Wade house payments w/ interest through May.  She then relieved us of our interest and changed our note to principal only.  So she only has interest income from us for 5 months."[73]

Also handwritten on the amortization schedule was the notation "principal only" and an "X" over a portion of the payments for 2009.[74]  There was no notation of a change to the principal balance on the amortization schedule, nor

---

[70]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement].
[71]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement].
[72]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement].
[73]    RR:    Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].
[74]    Id.

mention by Amanda Wade of the second effect of the Modification Agreement, which was the principal reduction.[75]

During Edell's lifetime she made clear her intent to treat each of her seven children equally. She repeatedly named each of her seven children as equal beneficiaries in a number of certificates of deposit, and did the extra paperwork required for naming each of the seven beneficiaries upon every renewal.[76] Her will, executed in 2003, left all of her estate to the seven children to "share and share alike."[77] Amanda testified that Edell's wishes "were that all seven children, I believe, would take equally."[78]

In the years leading up to Edell's passing after Johnny and Amanda had moved to the Ranch, Bud and his wife Gwen, as well as his sister Nancy, sensed a growing air of unwelcome from Johnny and Amanda when visiting Edell at the Ranch, and it became evident that Johnny and Amanda did not enjoy their visits.[79] Upon arrival to visit, Johnny or Amanda would be quick to arrive in the room, but not to partake in any visiting; rather, they seemed to be monitoring the family

---

[75]    Id.
[76]    CR:    [Nancy Burns Affidavit] 474 par. 6.
[77]    CR:    [2003 Will of Edell Wade] at 388-391.
[78]    CR:    [Amanda Wade Deposition] at 411.
[79]    CR:    [James "Bud" Wade Affidavit] 478 par. 9, 479 par. 10, par. 11, par 12; [Nancy Burns Affidavit] 474 par. 8, 475 par. 9, par. 10.

22

visits.[80] Bud learned that Johnny and Amanda had taken away Edell's ability to collect and manage her own mail.[81] He learned that Johnny and Amanda had intentionally locked the entrance gate to the Ranch to prevent family visits, a fact admitted to by Amanda.[82] Johnny also admitted that "they only way to take care of [his] mother's best interest was to exclude all [his] other siblings."[83]

On August 14, 2010, Edell Wade passed away. On October 4, 2010, Amanda Wade, as independent executor of the Estate of Edell Wade, filed the Inventory and Appraisement for the Estate identifying the debt owed by she and Johnny to the Estate.[84] The Inventory and Appraisement put Bud on notice that something was amiss with the 2004 sale of the Ranch and with Edell's finances.[85] It was only after his mother's death that Bud learned from Nancy that Johnny had stated to Edell that he could only afford to pay $500,000 for the Ranch.[86] He also learned from Nancy that, at the time of the 2004 sale, Nancy had asked Johnny to send out a letter to all of the siblings notifying them of the sale, but that Johnny refused to do it because he knew the sale would not happen if he told his brothers

---

[80]     CR:     [James "Bud" Wade Affidavit] 478 par. 9, 479 par. 10, par. 11, par 12; [Nancy Burns Affidavit] 474 par. 8, 475 par. 9, par. 10. [James "Bud" Wade Affidavit] 336-338. [Nancy Burns Affidavit] 473-476.
[81]     CR:     Id.
[82]     CR:     Id.; [Amanda Wade Deposition] 421.
[83]     CR:     [Johnny Wade Deposition] 438.
[84]     CR:     [Inventory and Appraisement] 336-338.
[85]     CR:     [James "Bud" Wade Affidavit] 479 par. 13.
[86]     CR:     [Nancy Burns Affidavit] 475 par. 11.

and sisters of his plans.[87]  Johnny testified that he did not communicate with his siblings about the sale at the time it took place or the time leading up to it.[88]

In October of 2010, Bud, spurred by receiving a copy of Amanda's Inventory and Appraisement, obtained a copy of the Modification Agreement from the Official Public Records of Burnet County, Texas.[89]  Bud also became aware of the contents of Edell Wade's file as retained by Pat Cavness, which his sister Nancy had obtained.[90]  Although Bud had an increasing concern over time that Johnny and Amanda had been controlling Edell Wade, and even aggressive towards Johnny's siblings on occasion, it wasn't until he was able to review the Inventory and Appraisement, the Modification Agreement and the contents of Mr. Cavness' file that he realized that the extent of their financial control over Edell, the extent of their self-interested actions, and the benefit that they had received from their position.[91]

## SUMMARY OF THE ARGUMENT

In 2004, Johnny and Amanda Wade, the son and daughter-in-law of Edell Wade, induced 89-year-old Edell Wade to sell her Ranch to them at far below fair market value, with seller-financing and on terms wholly favorable to themselves and not to Edell.  They moved onto the Ranch with Edell and positioned

---

[87]  CR:  [Nancy Burns Affidavit] 475 par. 11.
[88]  CR:  [Johnny Wade Deposition] 431-432.
[89]  CR:  [James "Bud" Wade Affidavit] 479 par. 13.
[90]  CR:  [James "Bud" Wade Affidavit] 479 par. 13; [Pat Cavness File] 347-387.
[91]  CR:  [James "Bud" Wade Affidavit] 479 par. 13.

24

themselves in a relationship of trust and confidence with Edell, which created a fiduciary relationship and which the Trial Court instructed the jury was in fact a fiduciary relationship. Johnny and Amanda proceeded to take control of her everyday affairs and to limit her access to the outside world and to the rest of her family. In 2007, Amanda Wade became attorney-in-fact for Edell Wade under a Power of Attorney. In 2009, Johnny and Amanda instigated a Modification to the terms of the Note from the sale of the Ranch, and eliminated the interest as well as reducing the principal in the amount of at least $40,000. By the time of Edell's death in 2010, the Estate had been denuded of its greatest asset – the Ranch – in return for a zero-interest 32-year note that was far less than the value of the Ranch. Johnny and Amanda were fiduciaries to Edell Wade at the time of the 2004 sale and at the time of the 2009 Modification, yet in each transaction they benefitted and she did not.

Edell did not receive any independent advice or have the benefit of full disclosure or scrupulous honesty, as required by Texas fiduciary law. Johnny and Amanda Wade's breaches of fiduciary duty were robust and well-documented. The Modification Agreement on its face is misleading and deceptive because its stated purpose is exclusively for the elimination of interest, and it does not acknowledge any principal reduction. There is no evidence that Edell Wade knew about the principal reduction; in fact the documentation reveals that neither the

25

lawyer nor Edell's accountant was made aware of a principal reduction.[92] The lawyer who drafted simply "inserted" an amount dictated by Amanda, and the accountant was told about the interest elimination only, and in 2010 – well after the execution of the Modification. The Trial Court erred in affirming the jury's findings regarding whether Johnny and Amanda respectively complied with their fiduciary obligations in relation to the Modification Agreement in 2009.

Bud Wade, who was not a party the sale of the Ranch and who had no duty in connection therewith, only discovered the unfavorable terms of the Note and later Modification in connection with the administration of the Estate in 2010, and he brought suit on behalf of the Estate in an effort to remedy the wrongs done to Edell and her Estate by Johnny and Amanda. The Trial Court ignored the discovery rule and the fact that, under the law, Bud had no duty to investigate the sale and, as such, could not be imputed with constructive notice of public records.

The Trial Court also wrongly imputed notice of financial terms of the 2004 sale and other information that were not within any actual knowledge of Bud, and that would have been impossible to glean from the content of any public records. The documents that were filed of public record at the time of the sale of the Ranch – the Deed of Trust and Warranty Deed – did not reveal the purchase price or the

---

[92]     RR:    Vol. 3 of 4 at 14-86 [Martin & Millican File]; Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].

26

terms of the sale, such as the interest rate.[93]  The information that was critical to, and the basis for, Bud's claims was <u>simply not discoverable</u> from any publicly filed document pertinent to the 2004 sale of the Ranch.  The Trial Court was thus wrong to grant summary judgment and prevent Bud from bringing his claims regarding the 2004 sale to be heard in front of a jury.

The transcript of the summary judgment hearing clearly documents that the Trial Court made improper findings of fact based on the Judge's personal feelings on familial relationships.[94]   Because of the Trial Court's mistake, Bud lost rescission of the sale of the Ranch as a remedy and was barred from telling the whole story to the jury.  He was deprived of an opportunity to demonstrate to the jury the true magnitude of loss caused by Johnny and Amanda's manipulation of the sale of the Ranch for far below market value in 2004.  By inducing Edell to make the sale, and then by methodically asserting increasing levels of control over Edell's decision-making and over her contact with her own children, Johnny and Amanda destroyed Edell's relationship with her family and successfully altered Edell's lifetime plan to have all seven of her children share equally upon her death. Johnny and Amanda now own the Ranch at a rock-bottom price and the remaining balance due to the Estate on the Note is far less than the value of the Ranch in 2004, in 2010 upon Edell's death, and what the Ranch is worth today.

---

[93]     CR:     [Deed of Trust] 321-335; [Warranty Deed with Vendor's Lien] 463-472.
[94]     RR:     Vol. 2 of 4 [Summary Judgment Hearing Transcript].

Bud seeks to right the wrongs done by Johnny and Amanda to his mother and his family, to be permitted his day in court where the whole and true story may be told to a jury. At the instant underlying trial, the Trial Court's improper summary judgment ruling stunted the story because the 2004 sale of the Ranch was off the table. This story is one of magnitude and involves ongoing breaches of fiduciary duty and manipulation, yet the jury was only given the opportunity to hear about the 2009 Modification. Plaintiff respectfully asks this Court to right the errors made by the Trial Court and remand for a new trial.

## ARGUMENT

**Issue 1: The Trial Court erred when it granted Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims), as modified and entered by the Trial Court on the 11th day of April, 2014.**

The usual presumption that a judgment is correct upon appeal does not apply in appeals of summary judgments. *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex. 1984). Evidence favorable to the non-movant will be taken as true. *Thomson Oil Royalty, LLC v. Graham,* 351 S.W.3d 162, 165 (Tex.App.—Tyler 2011, no pet.). Evidence that favors the movant's position will rarely be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965). Any conflicts are to be resolved in the appellant's favor. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150 (Tex. 2004). An appellate court reviews a trial court's summary

judgment de novo. *HCBeck, Ltd. v. Rice*, 284 S.W.3d 349 (Tex. 2009). When a party moves for both no-evidence summary judgment and traditional summary judgment, the Court of Appeals will first review the trial court's judgment under the no-evidence standard. *Merriman v. XTO Energy, Inc.,* 407 S.W.3d 244, 248 (Tex. 2013). If the reviewing court determines that summary judgment was improperly granted, the reviewing court will reverse the judgment and remand the cause for a trial on the merits. *City of Houston v. Trail Enterprises, Inc.*, 300 S.W.3d 736, 737 (Tex. 2009).

A summary judgment based on an affirmative defense, as here, presents "**a particularly heavy burden**" for a defendant to carry, since that defendant must also conclusively establish **all elements** of the affirmative defense. *Cobb v. TDCJ*, 965 S.W.2d 59, 61 (Tex.App.—Houston 1st Dist.] 1998, no writ) (reversing summary judgment). In a summary judgment on limitations, when the non-movant asserts that limitations has been tolled, the summary judgment movant must conclusively negate the applicability of the tolling and the movant cannot be entitled to summary judgment on a limitations defense absent a conclusive establishment of such. *Zale Corporation v. Rosenbaum*, 520 S.W.2d 889, 890 (Tex. 1975); *Jennings v. Burgess*, 917 S.W.2d 790, 793 (Tex. 1996). Thus, because Plaintiff properly pled the discovery rule, it was the Defendants' burden at summary judgment to further (1) conclusively establish the discovery rule does not

apply *and* (2) conclusively negate it if does apply. *Rhone v. Steel*, 997 S.W.2d 217, 223-4 (Tex. 1999); *Matter of Estate of Matejek*, 928 S.W.2d 742 (Tex.App.—Corpus Christi, 1996) *writ denied per curiam.*

The Order on the 2004 Sale was improper because genuine issues of material fact existed to precluded summary judgment, and Defendants failed to conclusively prove all essential elements of their affirmative defense of statute of limitations as a matter of law. The Defendants argued against the application of the discovery rule but failed to prove as a matter of law that there was no genuine issue of material fact regarding the date when Plaintiff did discover or should have discovered Defendants' misconduct and resulting injury. See *Matter of Estate of Matejek*, 928 S.W.2d 742 (Tex.App.—Corpus Christi, 1996) *writ denied per curiam* (grantee's estate had burden to conclusively establish when grantor discovered or should have discovered the fraud, and its summary judgment evidence did not meet that burden of proof); see also *In re Estate of Herring*, 970 S.W.2d 583, at 586 (Tex.App.—Corpus Christi 1998, no pet.) ("Specifically, a defendant seeking summary judgment on the basis of limitations must prove when the cause of action accrued and, when applicable, must negate the discovery rule by proving as a matter of law that there no genuine issue of fact about when the plaintiff discovered or should have discovered the nature of the injury.").

Plaintiff provided summary-judgment evidence that raised many fact issues on the discovery rule. Plaintiff testified by affidavit that he did not discover, and could not have discovered, critical facts regarding Defendants' misconduct until after the death of his mother, Edell Wade, including but not limited to the price, terms and forgiveness of indebtedness.[95] The Plaintiff discovered a "sale" but had no knowledge, no way to discover (the basis for the fraud claims were not discernible from any publicly filed records), and no duty to discover that the "sale" was a result of Defendants' misconduct until much later. Despite such evidence, the Trial Court failed to meet its requirement to take as true all evidence favorable to the non-movant Plaintiff and to view the evidence most favorably to the non-movant Plaintiff and to indulge every reasonable inference and resolve all doubts in favor of non-movant Plaintiff. *Limestone Prods. Distrib., Inc. v. McNamara,* 71 S.W.3d 308, 311 (Tex. 2002).

The Trial Court also misunderstood or misapplied the law and seemingly ignored several exceptions and caveats to the general rule of imputing constructive notice from public records, such as (1) that "if the claimed fraud occurred in the inducement, recordation of the document does not, of itself, give notice of the fraud," (*Matejek*, 928 S.W.2d at 744) and (2) a person may not be charged with constructive notice of information in public records, for purposes of limitations,

---

[95] CR: [James "Bud" Wade Affidavit] 478 par. 7, par. 8, 479 par. 12, par. 13; [Nancy Burns Affidavit] 474 par. 7, 475 par. 11.

unless that person was <u>under an obligation to search the records</u>; and (3) the rule that constructive notice is limited to the facts reflected on the face of the records, i.e. *what is actually discernible* from the public records. *Id; Kansa Reinsurance Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1370 (5th Cir. 1994). The Trial Court also improperly made a finding of fact as to Plaintiff's due diligence and when he had constructive notice of the basis for his claims seeking rescission of the 2004 Sale.

**Constructive notice is not a bar to actions for fraud or breach of fiduciary duty**

"The purpose of recording laws is to notify subsequent purchasers of the rights such instruments are intended to convey, and not to give protection to perpetrators of fraud." *Boucher v. Wallis*, 236 S.W.2d 519, 526 (Tex.Civ.App.— Eastland 1951). The Texas Supreme Court has held that constructive notice of county records does not operate as a bar to fraud actions, and Texas appellate courts have extended the same rule to breach of fiduciary duty causes of action. *De Toca v. Wise,* 748 S.W.2d 449, 451 (Tex. 1998) (constructive notice under the real property statutes is not a defense to a buyer's action asserting DTPA violations and fraud); *ECC Parkway Joint Venture v. Baldwin*, 765 S.W.2d 504, 509 (Tex.App.—Dallas 1989) (no entitlement to summary judgment on grounds of constructive notice of height restriction through deed records, applying *De Toca* rule on constructive notice to breach of fiduciary duty and negligent

misrepresentation). Defendants' statute of limitations arguments were required to fail as a matter of law, to the extent they relied on the constructive notice allegedly provided to Plaintiff by the 2004 recording to defeat fraud and breach of fiduciary duty claims.

**Plaintiff had no duty of reasonable diligence as to the 2004 sale of the Ranch**

The trial court improperly imposed a duty of reasonable diligence upon the Plaintiff regarding the 2004 sale of the Ranch. For purposes of limitations, a person may not be charged with constructive notice of the actual knowledge discernible from examination of public records unless that person was "under an obligation to search the records." *Kansa Reinsurance Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1370 (5th Cir. 1994). "The recording of a deed is only constructive notice of its contents to those whose duty it is to search the records." *D.T. Carroll Corp. v. Carroll*, 256 S.W.2d 429, 434 (Tex.Civ.App.— San Antonio 1953); *Boucher v. Willis*, 236 S.W.2d 519 (Tex.Civ.App.—Eastland 1951) (in suit by minor wards seeking to set aside probate court's order authorizing the sale of their mineral interest by guardian, wards could not have discovered fraud by exercise of ordinary due diligence until shortly before the suit; recording of deed was not constructive notice of fraud because wards were not under any legal duty to examine deed records and they were not in possession of facts that would cause them to inspect the records).

Defendants failed to prove that Plaintiff had any such duty or obligation of due diligence or that Plaintiff was in possession of facts that would cause him to investigate the sale. The evidence was undisputed that Plaintiff was not a party to the sale, was not a third-party beneficiary to the sale, was not involved in the sale, and was not even aware of the sale when it occurred in 2004, although he did learn of it at some point after.[96] In 2004, several years prior to Edell's death, Bud had no reason to question the sale because he had no knowledge of the terms of the transaction, of its fairness or unfairness, and had no duty of reasonable diligence under the law. Plaintiff did not acquire "constructive notice because there was no occasion for him to search the records when he had no reason to know or suspect that" Defendants purchased Edell Wade's property under egregiously one-sided terms to her detriment and their gain. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998); see also *Munawar v. Cadle Co.,* 2 S.W.3d 12 (Tex.App.—Corpus Christi 1990) (purchaser had no constructive notice of recorded agreement providing that a third-party owned gasoline pumps because there was nothing in the chain of title which would have referred him to that agreement). Thus, he could not be imputed with notice of the contents of the public records on the transaction.

---

[96]    CR:    [James "Bud" Wade Affidavit] 478 par. 6, 7.

Months after the sale, when Johnny and Amanda moved back to Texas in 2005, Bud still had no reason to suspect his brother and sister-in-law would do anything to take advantage of their mother.[97] Eventually over the years after they moved in at the Ranch, Bud, his wife Gwen and his sister Nancy did begin to feel increasingly unwelcome to visit Edell at the Ranch, and Johnny and Amanda appeared to want to control and monitor any visits.[98] However, Bud's frustration with Johnny and Amanda's demeanor and their seeming desire to control Edell Wade's ability to have family visit the property does not alone trigger a duty to investigate all of his mother's financial affairs while she was still living, of sound mind, and capable.

The Plaintiff's discovery of Defendants' misconduct truly did not occur until after the death of his mother when they were wrapping up her affairs.[99] During this time, after reviewing the Inventory of his mother's estate and the Modification Agreement, the Plaintiff became concerned that Defendants had taken financial advantage of his mother Edell.[100] At no time was Bud ever informed by Edell or by Johnny or Amanda of the terms of either the sale of the Ranch or the Modification Agreement, including the price, the interest rate, the alleged

---

[97]  CR:   [James "Bud" Wade Affidavit] 478 par. 6, 7, 8.
[98]  CR:   [James "Bud" Wade Affidavit] 478 par. 9, 479 par. 10, par. 11, par 12; [Nancy Burns Affidavit] 474 par. 8, 475 par. 9, par. 10. Id.; CR: [Nancy Burns Affidavit] 473-476.
[99]  CR:   [Nancy Burns Affidavit] at 474 par. 7; [James "Bud" Wade Affidavit] at 478 par. 5.
[100] CR:   [James "Bud" Wade Affidavit] 479 par. 13.

forgiveness of principal, the elimination of the interest rate or any other terms.[101] Bud learned the details only after the passing of his mother and in connection with the administration of her estate.[102]

Prior to his mother's death, Bud had no duty to investigate her financial decisions and transactions. A duty did arise, however, after Edell's death because Bud was a beneficiary of her estate and therefore then took on a duty of reasonable diligence in connection with the estate of Edell Wade. "Texas law charges all persons interested in an estate with knowledge of the contents of the probate records." *Mooney v. Harlin*, 622 S.W.2d 83, 84 (Tex. 1981); see also *Chapal v. Vela*, 461 S.W.2d 466, 470 (Tex.Civ.App.—Corpus Christi 1970) (charging devisees under a will with constructive notice of all of the ownership of land by the father's estate). Prior to August of 2010, Plaintiff had no duty to investigate; as of August 2010, he did. Indeed, upon Edell's death, Bud was prompted to inquire into the property interests and debts owed to her estate.[103] He fulfilled his duty of reasonable investigation and diligence by obtaining all copies of documents that he could regarding the sale, by examining other pertinent records (e.g., financial

---

[101]  CR:   [James "Bud" Wade Affidavit] 478 par.6, par. 7, 479 par. 13.
[102]  CR:   Id.
[103]  CR:   [James "Bud" Wade Affidavit] 479 par. 13.

statements, bank statements and Pat Cavness' file), and by bringing suit within the applicable statute of limitations.[104]

**Defendants' misconduct was not discoverable from the public records**

Even if Bud had reviewed the public records pertinent to the sale of the Ranch in 2004 – despite the fact that he had no duty to do so and it was not permissible for him to be imputed with constructive notice of the information therein – examination of such records would not have given him notice of his claims. "Constructive notice is limited to facts reflected on the face of the records." *Matter of Estate of Matejek,* 928 S.W.2d 742, 744 (Tex.App.—Corpus Christi 1996, writ ref'd) (citations omitted). For example, "if the claimed fraud occurred in the inducement, recordation of the document does not, of itself, give notice of the fraud." *Id.* Defendants failed to offer any evidence of how a title examination would have placed Bud on constructive notice of the specific terms of the sale of the Ranch, or of the fraud or breach of fiduciary duties committed by each Defendant in connection therewith.

The Deed of Trust and Warranty Deed were the only documents filed of record in the Official Public Records of Burnet County, Texas on March 3, 2004.[105] Defendants attempted to offer the Warranty Deed and the Deed of Trust as evidence that Plaintiff was on notice of his claims contesting the terms of the

---

[104]    Id.

[105]    CR:    [Deed of Trust] 321-335; [Warranty Deed with Vendor's Lien] 463-472.

real estate transaction as of that date, and to argue that the limitations period began to run at that time. However, these arguments should have failed because nowhere in those documents was the actual "purchase price" of the property listed, nor specifics on what was being purchased, nor what the financing terms were. The financial terms were not disclosed in any documents of public record. In fact, the only document reflecting the terms of the sale was the Promissory Note, which was <u>not recorded</u>.

The Trial Court was wrong to impute notice of financial terms that were not within Bud's actual knowledge and that also could not have been gleaned from the content of any public records (which he had no duty to search). No matter how closely Bud examined the official records he had access to, it would have been impossible for him to glean the basis for his claims.

**Plaintiff Bud Wade did not have notice of his claims until 2010**

A cause of action for fraud accrues upon its discovery, or from the time the fraud might have been discovered through the exercise of reasonable diligence. *See Matter of Estate of Matejek,* 928 S.W.2d at 744. Knowledge of facts which would have excited inquiry in the mind of a reasonably prudent person, which if pursued by him with reasonable diligence would lead to discovery of fraud, is equivalent to knowledge of the fraud as a matter of law. *Id.* The defrauded party

must be cognizant or aware of facts which would have caused the ordinarily intelligent and prudent person to investigate. *Id.*

It was not until 2010 that Bud was aware of facts that would cause a reasonably prudent person to discover Defendants' fraud and misconduct.[106] Bud was not aware of the 2004 sale until after it occurred.[107] The Promissory Note was the only document that states the disparate terms of the sale, and it was not recorded. When Defendants first moved back to Texas in 2005, Bud had no reason to think they were taking advantage of his mother.[108]

Unlike in *Chapal*, a case the Defendants relied upon in their summary judgment briefing,[109] Plaintiff was **not** "cognizant of all of the alleged acts of undue influence" at the time of the real estate transaction. See *Chapal v. Vela*, 461 S.W.2d 466, 470 (Tex.Civ.App.—Corpus Christi 1970). There, the appellate court said that the facts at the time of the transaction were "equally convincing" when they were first "personally known," as they were later after limitations had expired. *Id.* at 469. In *Chapal*, a father conveyed land to two sons, and the court charged constructive notice of the publicly recorded deed to a third brother who was not a party to the sale, but who had learned of the sale at or near the time it occurred. However, in *Chapal* there was a duty that does not exist here: there the brother

---

| | | |
|---|---|---|
| 106 | CR: | [James "Bud" Wade Affidavit] 479 par. 13. |
| 107 | CR: | [James "Bud" Wade Affidavit] 478 par. 6, 7. |
| 108 | CR: | 5-22 [Defendants Amended Motion for Partial Summary Judgment concerning the 2004 Sale]. |

had a duty of inquiry because the same year that the deed was recorded, his father passed away and he became a devisee and thus had an interest in the ownership of his father's land. Additionally, the *Chapal* evidence showed that the brother had been aware of all of the alleged acts of undue influence around the same time they occurred. That is not the case here.

Another case relied upon by Defendants, which they introduced at the summary judgment hearing, *Veltmann v. Damon*, is distinguishable because it involves both a duty and an awareness of facts that Bud did not have in 2004.[110] *Veltmann v. Damon,* 696 S.W.2d 241 (Tex.App.—San Antonio 1985) writ granted, affirmed in part, reversed in part). The *Veltmann* appellate court upheld the trial court's finding that that the plaintiff's action to set aside the deed was barred by limitations and held that, "as a matter of law, any cause of action to set aside the deed accrued on the date of its recording." *Id.* at 244. However, again in that case the plaintiff had a duty that Bud did not have in 2004. The plaintiff in *Veltmann* was a son who had a conditional interest in the land subject to the deed, as it had had been specifically devised to him upon the prior death of his father and he was aware of that fact, and thus had duty of reasonable diligence. *Id.* Plaintiff Bud Wade had no such duty until the death of Edell Wade in 2010 when she devised a one-seventh interest in her estate to her son Bud Wade.

---

[110]    RR:    Vol. 2 of 4 at 30 [Summary Judgment Hearing Transcript].

Yet another case urged by the Defendants,[111] *Rentfro v. Cavazos IV,* is distinguishable because both a duty of diligence based on an interest in the land existed and also in existence was the awareness of certain facts that were the basis for setting aside the deed long before the filing of suit. *Rentfro v. Cavazos IV*, 2012 WL 566364 (Tex.App.—San Antonio, September 21, 2012). The plaintiff's affidavits themselves established her awareness of the alleged facts before or soon after the deeds were signed. *Rentfro*, 2012 WL 566364 at 9-11.

At the time of the real estate transaction in 2004, Bud did not have access to information that would have been "equally compelling" at the time as he did at the time this suit was filed, and he did not have "means . . . at hand to readily discover" the wrongdoing. *Chapal* at 470. It was not any of Bud's business, much less his duty, to pry into his mother's real estate transaction in 2004, the purchase price and terms of which he was not even aware, and which could not have been discernible from the county records even if he had looked. Moreover, Bud had no reason to doubt the forthrightness of his brother and sister-in-law's dealing with his mother. In this case, the information regarding their misconduct and self-dealing accumulated over the years and it was not until the news of the Modification

---

[111]    CR:    5-22 [Defendants Amended Motion for Partial Summary Judgment concerning the 2004 Sale].

Agreement *after* Edell Wade's death that Plaintiff had an inkling of wrongdoing in the form of fraud or breach of fiduciary duty.[112]

**Due Diligence is a question of fact for the jury**

The test of reasonable due diligence is a question of fact for the jury, not for the judge. *See In re Estate of Fawcett*, 55 S.W.3d 214, 221 (Tex.Civ.App.— Eastland 2001). In an action to set aside a deed based on a claim of fraud, it accrues upon discovery of the fraud, and the question of when the fraud was discovered or should have been discovered is ***a fact question that precludes summary judgment***. *Matter of Estate of Matejek*, 928 S.W.2d 742 (Tex.App.—Corpus Christi, 1996). Defendants did not "prov[e], as a matter of law, that there is no fact issue concerning when [Plaintiff] discovered or should have discovered the harm." *Id.* at 745.

Bud never claimed that he should be excused from exercising due diligence, and asserted that he did in fact exercise due diligence as soon as his duty to do so was triggered in 2010 in connection with the administration of the estate and its contents.[113] See, e.g., *Mooney v. Harlin*, 622 S.W.2d 83 (Tex. 1981) (four-year statute of limitations on a fraud claim began to run when the will was admitted to probate, whereupon the parties were charged with notice of probate records). Bud was not aware that Defendants had taken advantage of Edell Wade and benefited

---

112     CR:     [James "Bud" Wade Affidavit] 479 par. 13.
113     CR:     [James "Bud" Wade Affidavit] 479 par. 13.

so egregiously at her expense until 2010. Appropriately, Bud Wade then timely filed suit within four years of the administration of the estate and the discovery of information that put him on notice of Defendants' fraudulent acts and other misconduct.

**The Trial Court Made Improper Fact-Findings**

The transcript of the summary judgment hearing clearly documents that Judge Savage made fact findings. At the hearing, Judge Savage asked, noting the period during which Edell Wade was living after the 2004 Sale:

> "Why didn't the son call mom and say, Mom what's going on? . . . he was aware of the fact that there was a sale but didn't inquire of his mother or anyone else what the terms of the sale were. If he was so concerned about all of this, why didn't he inquire using the - - I'm not talking about going down and digging through public records. I'm talking about picking up the phone or dropping by and saying, what's going on?"[114]

The Court's query presumes (a) that Bud had a duty to investigate the sale, (b) that Bud was on notice of wrong-doing by his brother and sister-in-law, and (c) that he failed live up to an alleged duty prior to his mother's passing. These are all fact questions for a jury, as the existence of a duty of reasonable due diligence and whether that duty was fulfilled is a *question of fact* for the jury, not for the judge. *See In re Estate of Fawcett*, 55 S.W.3d at 221.

At the conclusion of the hearing Judge Savage further stated:

---

[114]     RR:     Vol. 2 of 4 at 66 [Summary Judgment Hearing Transcript].

"All right. After hearing the evidence -- and let me just say this. I know that families, kids and families, may take advantage of a parent to the detriment of the other kids. I also know that sons don't want to rock the boat if mama is happy and bring her into the picture of a possible conflict between the kids. They want their mom to have a happy home, happy life. And I don't think that possibly mom got the best deal, but at the same time mom got other benefits as a result of this deal. And that is to have someone at the ranch caring for her. **I can understand why** he insisted upon buying the ranch if he was going to live there and take care of mom. **Then that would be in effect, in my mind**, a part of the consideration of the sale of the ranch, was that promise from her son."[115]

Again, this statement is replete with language that implicates impression, inference, and fact-finding that properly should be the provenance of the jury.

The transcript clearly shows that the Court made improper fact assumptions and failed to indulge every reasonable inference in favor of the Plaintiff, the non-movant, and, thus, erred in granting the Order at issue.

**Issue 2:**	**The Trial Court erred when it approved of the jury's findings in response to Jury Question No. 1 and Jury Question No. 2 finding that Johnny and Amanda Wade complied with their fiduciary duties to Edell Wade in connection with the Modification Agreement.**

The Trial Court directed the jury that "a relationship of trust and confidence existed because Edell Wade justifiably placed trust and confidence" in both Johnny Wade and Amanda Wade.[116]   The jury was then instructed that, in order for the

---

[115]	RR:	Vol. 2 of 4 at 75 [Summary Judgment Hearing Transcript].
[116]	CR:	[Charge to the Court] at 1541, 1543.

44

acceptance of the Modification to be shown to have been in compliance with fiduciary obligations, the Defendants had to prove **each** of the following:

(a) The transaction in question was fair and equitable to Edell Wade; **and**

(b) [Johnny and Amanda] made reasonable use of the confidence that Edell Wade placed in [them]; **and**

(c) [Johnny and Amanda] acted in the utmost good faith and exercised the most scrupulous honesty toward Edell Wade; **and**

(d) [Johnny and Amanda] placed the interests of Edell Wade before [their] own, did not use the advantage of [their] position to gain any benefit for [themselves] at the expense of Edell Wade, and did not place [themselves] in any position where [their] self-interest might conflict with [their] obligations as a fiduciary.

[117] [emphasis added.]

When an appellant who does not have the burden of proof at trial attacks the legal sufficiency of an adverse finding, the appellant must demonstrate that there is no evidence to support such finding. *Porter v. Denas¸* 2006 WL 1686515, *4 (Tex.App.—San Antonio, 2006). When reviewing a no evidence claim, the scope of review for an appellate court is only the evidence and inferences that tend to support the findings, while disregarding all evidence or inferences to the contrary. *Minn. Mining & Mfg. Co. v. Nishika, Ltd.,* 953 S.W.2d 733, 738 (Tex. 1997).

When the appellant without the burden of proof at trial attacks the factual sufficiency of an adverse finding, the appellant must demonstrate that there is

---

[117]    CR:    [Charge to the Court] at 1541, 1543.

45

insufficient evidence to support the finding. *Plas-Tex, Inc. v .U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989.) In reviewing a factual insufficiency challenge, an appellate court must examine all evidence in support of and contrary to the court's finding. *Id.*

Texas law applies a <u>presumption of unfairness</u> to transactions between a fiduciary and a party to whom the fiduciary owes her duties. *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex. 1980). Under Texas fiduciary law, the 2009 Modification was *presumptively* fraudulent and unfair because Amanda and Johnny were fiduciaries to Edell (as ruled as a matter of law by the Trial Court and instructed as such)[118] and they benefitted from it, and thus they bore the burden of demonstrating it to be otherwise. *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex. 1980) (the nephew of an elderly woman caused her to transfer certain property to him before her death; the court concluded the nephew was a fiduciary and as a result, a presumption arose that any gift from the aunt, the principal, to him as a fiduciary was unfair and invalid). This shifts the burden to the profiting fiduciary to demonstrate the fairness of the transaction and "the fiduciary must show proof of good faith and that the transaction was fair, honest and equitable." *Collins v. Smith*, 53 S.W.3d 832, 840 (Tex.App.—Houston [1st Dist.] 2001, no pet.).

---

[118]     CR:     [Charge to the Court] at 1541, 1543.

In addition to a fiduciary relationship based on a family relationship of trust and confidence, Amanda Wade was also a fiduciary to Edell by merit of her capacity as Edell's attorney-in-fact under the power of attorney.[119] Texas appellate courts often review whether attorney-in-fact fiduciaries have met their burden where they benefit from their principal and have time and again reiterated the high standards of conduct as a fiduciary and the burden to show fairness to a "scrupulous" degree. For example, the El Paso Court of Appeals in *Vogt v. Warnock* held that where an individual possessing power of attorney receives a gift or bequest from the principal, the fiduciary relationship "cast[s] upon the profiting fiduciary the burden of showing the fairness of the transaction," so that the fiduciary <u>must</u> "be prepared to prove the transaction was conducted with <u>scrupulous fairness</u>." *Vogt v. Warnock*, 107 S.W.3d 778, 783-784 (Tex.App.—El Paso 2003, pet. denied); see also *In re Guardianship Walzel*, 2010 WL 335686 (Tex.App.—Corpus Christi-Edinburg, Jan. 28, 2010) ("Regardless of whether a fiduciary acts under the power of attorney, the execution of the power of attorney conclusively establishe[s] the fiduciary relationship," and gifts from the principal to the attorney-in-fact, while not prohibited, must be shown by the fiduciary to have been conducted with "scrupulous fairness"); *In re Estate of Miller*, 2014 WL 3970766, 446 S.W.3d 445 (Tex.App.—Tyler, Aug. 13, 2014) (son with a power-

---

[119]    CR:    [Power of Attorney] 397-399.

of-attorney could not show that he did not engage in self-dealing by making interest-free loans to himself).  The standard of conduct is a "stringent standard undiluted by exceptions."  *Vogt* at 778; *Jordan v. Lyles*, 455 S.W.3d 785 (Tex.App.—Tyler 2015).

Per *Vogt v. Warnock, Jordan v. Lyles*, and other Texas precedent, it is clear that Amanda, as a fiduciary and attorney-in-fact, did not have the luxury of picking and choosing when and to what degree she would serve to protect Edell Wade's best interests.  *Vogt* at 778; *Jordan v. Lyles*, 455 S.W.3d 785, 794 (Tex.App.—Tyler 2015).  Amanda Wade owed Edell Wade, her principal, "a high duty of good faith, fair dealing, honest performance, and strict accountability."  *Vogt v. Warnock*, 107 S.W.3d at 782.  Acceptance of a statutory power of attorney "imposes on [the attorney-in-fact] legal duties that continue until [the attorney-in-fact] resign[s] or the power of attorney is terminated or revoked by the principal or by operation of law."  TEX. ESTATES CODE § 752.051.  In *Vogt* the El Paso Court of Appeals specifically held that an attorney-in-fact is obligated to uphold their fiduciary duties from the acceptance of the power of attorney and onward until its termination, even when they have not yet acted under the auspices of the power of attorney and the transaction was not in the scope of the power of attorney. *Vogt* at 778.  The same was recently held, and *Vogt* reinforced, by the Tyler Court of Appeals, which held that there was no evidence that the holder of a

48

power of attorney informed the principal of all material facts of the transactions and a breach of fiduciary duty had been demonstrated. *Jordan v. Lyles*, 455 S.W.3d 785 (Tex.App.—Tyler 2015).

"Critical" to determining whether there was a breach of fiduciary duty is the 'determination of whether there was under the circumstances a good faith effort on the party of [the party claiming validity] to <u>fully inform</u> [Edell] of the nature and effect of the transactions." *Vogt v. Warnock*, 107 S.W.3d at 778. Both Johnny and Amanda had a duty to ensure that Edell's decisions in connection with the Modification were the result of "voluntary and intelligent consideration." *Stephen County Museum, Inc. v. Swenson*, 571 S.W.2d 257, at 261 (Tex. 1974). Also part of their duty was to ensure that Edell had proper advice as to her financial choices, as well as to ensure the material facts, such as to value, were clearly provided and documented. *Id.;* see also *Porter v. Denas*, 2006 WL 1686515, *4 (Tex.App.—San Antonio, June 21, 2006, pet. denied) (fiduciary duties of nephew and grandniece who provided assistance in financial affairs in a fiduciary capacity, and who permitted themselves to remain beneficiaries on their elderly aunt's IRA, had duties that included advice to her regarding her IRA).

Johnny and Amanda, by respectively accepting both their roles as a fiduciary *and the Modification which benefited them by eliminating interest as well as an alleged gift of debt forgiveness of around $40,000*, from Edell, consented to have

their conduct measured by an **even higher standard of loyalty**. *Vogt*, 107 S.W.3d at 783, citing *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 508 (Tex. 1980).

Defendants bore the burden of proof to show that they each complied with their fiduciary duties and were required to prove <u>all</u> of the elements set out in Jury Questions No. 1 and No. 2. However, there is no evidence to support the answers to Jury Question No. 1, *i.e.*, that when Johnny Wade accepted the Modification Agreement, he complied with all of his duties to Edell Wade under his fiduciary relationship of trust and confidence with Edell Wade. Nor is there evidence to support the answer to Jury Question No. 2, *i.e.*, that when Amanda Wade accepted the Modification Agreement, she complied with all of her duties to Edell Wade under her fiduciary relationship of trust and confidence with Edell Wade. The evidence is insufficient to support the answer "Yes" to Jury Question No. 1 as well as the "Yes" answer to Jury Question No. 2. In fact, the jury's answer to these questions was against the great weight and preponderance of the evidence and is manifestly unjust.

**Defendants Could not Show the Transaction was Fair and Equitable**

Element (a) of both Jury Questions No. 1 and No. 2 required Defendants to prove that the Modification Agreement transaction was a transaction that was <u>fair and equitable</u> to Edell Wade. However, the Modification Agreement, by its own

terms, was not fair and equitable to Edell Wade as the reduction in principal and elimination of interest were wholly for the benefit of Defendants and to the detriment of Edell Wade. No evidence was presented at trial that the Modification Agreement was fair and equitable to Edell Wade; in fact, the only assertions during trial that the transaction was fair and equitable to Edell Wade were comments made by Defendants' counsel regarding the emotional benefit Edell Wade may have received from making a purported gift to Johnny and Amanda Wade. Statements made by counsel during trial are not evidence and should not be considered as such by the jury.

Defendants did not meet their burden to prove that the Modification Agreement was fair and equitable to Edell Wade, and trial exhibits introduced to the jury demonstrate otherwise. First, the Modification Agreement, admitted into evidence as Plaintiff's Exhibit 11, states on its face, in bold type:

**\*THE PARTIES STATE HEREBY THAT THIS MODIFICATION IS FOR THE SOLE PURPOSE OF ELIMINATING THE OBLIGATION OF OBLIGOR TO PAY TO HOLDER INTEREST ON THIS LOAN.\*[120]**

Thus the only <u>stated</u> purpose of the Modification Agreement was that it was to eliminate the obligation to pay interest, and the only benefit of that was to Johnny and Amanda Wade, not to Edell Wade. It is <u>impossible</u> to tell from the face of the document, but the Modification Agreement also eliminated around

---

[120]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement].

51

$40,000 from the principal balance due (*i.e.*, around 15% of the principal) without explanation or identification.[121]

It is undisputed that the Modification Agreement resulted in lower monthly payments to Edell Wade and later to her Estate, as well as a balance on the Note that was reduced to even lower than the already less than fair market value it initially had, due to principal reduction. Defendants' own trial exhibit documented the payments made on the Note before and after the Modification and show that the payments dropped from $1,849.00 to $1,200.00.[122] There was no benefit to Edell Wade that resulted from the Modification. The Defendants did not meet their burden to show that it was fair and equitable for these reasons and more.

**Defendants Could Not Show Utmost Good Faith and the Exercise of Scrupulous Honesty**

Element (c) of both Jury Questions No. 1 and No. 2 required Defendants to prove that Johnny and Amanda Wade each acted in the <u>utmost good faith and exercised the most scrupulous honesty towards Edell Wade</u>. However, there was no evidence that Edell Wade had full disclosure of material facts or that she even knew all of the terms of the Modification Agreement, especially that the principal had been reduced by about $40,000, and there is no evidence that she had the

---

[121]    RR:    Vol. 3 of 4 at 6-13 [Modification Agreement].
[122]    RR:    Vol. 4 of 4 at 3 [Defendants' Payments Exhibit].

benefit of independent advice.  In fact the opposite can be demonstrated through clear and undisputed documentation that was presented to the jury.

The evidence in fact clearly demonstrated that Johnny and Amanda Wade controlled the flow of information with Michael Martin regarding the terms of the Modification Agreement.  This evidence was presented in the Martin & Millican file and the Work Order admitted into evidence as part of Plaintiff's Exhibit 38, showed that Johnny and Amanda Wade were the clients of Michael Martin.  The Martin & Millican file on the Modification Agreement identifies the client in the matter as "Johnny Wade et ux," *i.e.* Johnny and his wife Amanda.[123]  The Martin & Millican file contains a work order that logged the date and line items of work done on the Modification Agreement.[124]  The name "Edell Wade" does not appear anywhere in the work order, but Johnny and Amanda's names do.[125]  The file also contains a copy of a June 15, 2009, invoice for balance due of $299.30 to "Mr. & Ms. Johnny Wade" for "modification of note"; the invoice does not contain the name "Edell Wade" in the description of services rendered, as a client, nor as a recipient of the bill.[126]  The file also contains a copy of a June 15 2009, letter to Johnny and Amanda Wade stating "Enclosed are a copy of recorded Modification Agreement, the original of which has been sent to Edell Wade and your file

---

123    RR:    Vol. 3 of 4 at 14, 15 [Martin & Millican File].
124    RR:    Vol. 3 of 4 at 15 [Martin & Millican File].
125    Id.
126    RR:    Vol. 3 of 4 at 19 [Martin & Millican File].

regarding the matter which you left with us. Also enclosed is a bill for services."[127]

The <u>only</u> evidence of communication between Michael Martin or anyone at the firm and Edell Wade regarding the Modification Agreement is dated <u>after</u> the execution of the Modification Agreement, and is a two-line correspondence to Edell dated June 15, 2009, that states "Enclosed is original recorded Modification Agreement for your files. A copy has been sent to Johnny and Amanda Wade."[128] In contrast, the file does contain an account statement to Edell Wade for legal work on her will in 2007, with a different file number.[129]

The Martin & Millican file also showed that, subsequent to a telephone call with Amanda Wade on May 26, 2009, Mr. Martin sent the Modification Agreement to Johnny Wade with a cover letter dated May 26, 2009, admitted into evidence as part of Plaintiff's Exhibit 38, containing the statement that he had, "inserted the balance of $227,528.00, reduced the interest rate to zero, and made the monthly payment $1,200 **per Amanda's phone call** of the 26th."[130]

The jury was also shown a note sent from Amanda Wade to Edell Wade's accountant Lori Graham in 2010, in connection with the preparation of Edell's 2009 tax return, advising Lori Graham that the interest under the Promissory Note

---

[127]    RR:    Vol. 3 of 4 at 21 [Martin & Millican File].
[128]    RR:    Vol. 3 of 4 at 20 [Martin & Millican File].
[129]    RR:    Vol. 3 of 4 at 47 [Martin & Millican File].
[130]    RR:    Vol. 3 of 4 at 24 [Martin & Millican File].

had been eliminated in 2009. This note was admitted into evidence as Plaintiff's Exhibit 7.[131] In that handwritten note, which was stuck to a page of the amortization schedule on the Note, Amanda Wade stated:

> "Lori – We paid Mrs. Wade house payments w/ interest through May. She then relieved us of our interest and changed our note to principal only. So she only has interest income from us for 5 months."[132]

Also written on the amortization schedule was the notation "principal only" and an "X" over a portion of the payments for 2009.[133] There was no notation of a change to the principal balance on the amortization schedule, nor mention by Amanda Wade of the second effect of the Modification Agreement, which was the principal reduction.[134] The note to Lori Graham is interesting, in part, because it indicates that Edell's accountant was not informed of the elimination of interest at the time of the Modification Agreement, but only afterwards for tax preparation; thus Edell's accountant was not consulted with regarding any potential benefit or lack thereof to Edell Wade from the Modification.

There is simply no evidence that Edell Wade wanted to modify the terms of the Note, much less to reduce the principal or engage in debt forgiveness. In fact, there is no evidence that Edell Wade was aware that principal reduction was part of

---

131     RR:     Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].
132     RR:     Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].
133     Id.
134     Id.

the Modification.  The Modification Agreement, which she did sign, states that it is for elimination of interest <u>only</u>.

In fact, the documentation indicates that <u>even the lawyer on the deal, as well as Edell's accountant, were aware only of the elimination of interest and not of the principal reduction</u>.  The Martin & Millican file and the Modification Agreement together indicate that Amanda and Johnny did not even tell the lawyer who prepared it, Michael Martin, that principal reduction was part of the deal.  The initial intake notes on Martin's work order log state that the intent was to either eliminate interest <u>or</u> reduce principal, not both.[135]  The Modification states in bold and all-caps that it is for the elimination of interest only.  Mr. Martin also wrote to his client Johnny Wade that the principal balance had been "inserted" based on what he was told by Amanda, but nothing in his file indicates that he understood that to be a reduction.[136]

The documentation submitted to the jury also demonstrated that Edell Wade's accountant, Lori Graham, also was not informed of the principal reduction component of the Modification Agreement.[137]  Amanda's note to Lori Graham fails to cite to the principal reduction or to direct her to adjust the Note

---

[135]    RR:    Vol. 3 of 4 at 15 [Martin & Millican File].
[136]    RR:    Vol. 3 of 4 at 24 [Martin & Millican File].
[137]    RR:    Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].

amortization schedule to reflect such reduction, and would indicate that Lori Graham was not told about the principal reduction.[138]

There is no documentary evidence of any calculation of the reduction in principal, or how the $227,528.00 principal balance "inserted" into the Modification Agreement was arrived at. Lori Graham's amortization indicates the principal was $40,149.84 higher than that.[139] Nor is there is no indication that Edell Wade wanted to make a gift to Johnny and Amanda in the form of debt forgiveness, or that she was even aware of the principal reduction.

**Defendants could not show that they placed the interest of Edell Wade before their own; that they did not take advantage of their position to gain benefit; or that their self-interest did not conflict with their obligations as fiduciaries.**

Element (d) of Jury Questions No. 1 and No. 2 required that Defendants prove that each of Johnny and Amanda Wade placed the interest of Edell Wade before his or her own, did not use the advantage of their position to gain benefit for themselves at the expense of Edell Wade, and did not place himself or herself in any position where their self-interest might conflict with their obligations as a fiduciary. As set forth above, there was no evidence that Johnny Wade and Amanda Wade each placed their own interests before those of Edell Wade, did not use their position to gain benefit for themselves at the expense of Edell Wade, and acted in the utmost good faith or exercised the most scrupulous honesty toward

---

[138]    RR:    Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].
[139]    RR:    Vol. 3 of 4 at 3 [Amanda Wade Note to Lori Graham].

Edell Wade – in fact, the opposite can be demonstrated through clear and undisputed documentation that was presented to the jury.

The overwhelming evidence in this case is that Johnny Wade and Amanda Wade each not only placed themselves in a position where their self-interest *might* conflict with their fiduciary obligations, they placed themselves in a position where their self-interest *did* conflict with their fiduciary obligations. The only interest Johnny Wade and Amanda Wade could possibly have served by entering into a transaction with Edell Wade which was to their benefit (and to Edell Wade's detriment) was their own self-interest.

As previously noted, the jury saw a chart of the payments made by Defendants to Edell Wade, along with copies of checks and bank statements reflecting those payments, admitted into evidence as Defendants Exhibit 1.[140] The chart created by the Defendants themselves clearly evidenced the reduced payments made by Defendants beginning on June 1, 2009, which resulted in less money received by Edell Wade (to her detriment) and more money retained by Johnny and Amanda Wade (to their benefit).[141]

The Tyler Court of Appeals has recently noted, in a very similar case, that the term "benefit" is defined as "an advantage," which is itself defined as a "relatively favorable position." *Jordan v. Lyles*, 455 S.W.3d 785 (Tex.App.—

---

[140]  RR:  Vol. 4 of 4 at 3 [Defendants' Payments Exhibit].
[141]  RR:  Vol. 4 of 4 at 3 [Defendants' Payments Exhibit].

Tyler 2015). The court reiterated the requirement that "the burden is on the fiduciary to show that she acted fairly and informed the principal of all material facts relating to the alleged transaction." *Id.* at 792. "Even in the case of a gift between parties with a fiduciary relationship, equity indulges the presumption of unfairness and invalidity, and requires proof at the hand of the party claiming validity of the transaction that it is fair and reasonable." *Id.*, citing *Estate of Townes v. Townes*, 867 S.W.2d 414, 417 (Tex.App.—Houston [14ᵗʰ Dist.] 1993, writ denied). The *Jordan* court found the daughter-in-law who held a power of attorney had failed to meet her burden to prove "that she or anyone else specifically discussed the transactions at issue with the older man and informed him of all material facts relating to them." *Id.* at 794. The attorney-in-fact's argument that she was not acting under her power of attorney when she executed the transactions, and thus could not have breached her fiduciary duty also failed. The *Jordan* court, invoking the *Vogt* opinion, held that she could not dilute her fiduciary duty to the principal with such an exception, and quoted *Vogt* where the court of appeals held that a fiduciary's duty should be viewed by a "stringent standard undiluted by exceptions." *Jordan v. Lyles*, 455 S.W.3d at 794, quoting *Vogt* at 778.

The Defendants failed to overcome the presumption of unfairness and undue influence that attaches to transactions entered into during the existence of a

59

fiduciary relationship. There is no evidence that they met their burden and complied with their fiduciary obligations, which were even more stringent in light of the benefits they received under the Modification. There is no evidence that Edell benefitted. The Modification Agreement, the Martin & Millican file, the Defendant's chart of payments, and the Lori Graham amortization and note speak for themselves on this matter.

## New Trial

Plaintiff seeks a new trial in which he can put on the full story of the wrongs committed by Johnny and Amanda Wade over the years, beginning with the 2004 sale of the Ranch and continuing through Edell's last years, her death, and the administration of the Estate (in which Amanda served as independent executor). The jury was only allowed to hear only a slanted, limited version of events that began with the Modification. The full story is one of ongoing manipulation and positioning by Johnny and Amanda in order to leverage power and control over Edell Wade, take over her decisions for her, deprive her of professional advice or independent counsel, strictly curtail her access to family visits and company, and ultimately denude Edell and her Estate of not only the overwhelmingly most significant asset – the Ranch – at far below market value, but then going on to further diminish Edell's assets by eliminating interest as well dropping the principal on the Note through the Modification. Plaintiff respectfully requests this

Court to permit him to put on the trial to a jury and tell the <u>full</u> story, as he would have had the Trial Court not wrongfully barred him from doing so.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, James E. Wade prays that this Court overturn the Summary Judgment Order and the Final Judgment in this case and remand the case for a new trial. Appellant further prays for such other relief, whether at law or in equity to which this Court deems he is justly entitled.

Respectfully submitted,

RICHIE & GUERINGER, P.C.

BY:   /s/ *Sheldon E. Richie*
     SHELDON E. RICHIE
     State Bar of Texas No. 16877000
     Email: srichie@rg-austin.com
     EMILY J. SEIKEL
     State Bar of Texas No. 24072331
     Email: eseikel@rg-austin.com
     100 Congress Avenue, Suite 1750
     Austin, Texas 78701
     512-236-9220 telephone
     512-236-9230 facsimile

     ATTORNEYS FOR APPELLANT
     JAMES E. WADE

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rules of Appellate Procedure 9.4, the undersigned certifies Appellant's Brief complies with 9.4.

1. Exclusive of the exempted portions in Texas Rules of Appellate Procedure 9.4(i)(1), Appellant's Brief contains 12,801 words.

2. Appellant's Brief has been prepared in proportionally spaced typeface using Microsoft Word Version 2007 in Times New Roman 14 point.

3. The undersigned has provided an electronic version of Appellant's Brief.

4. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of Texas Rules of Appellate Procedure 9.4, may result in the Court's striking Appellant's Brief.

*/s/ Emily J. Seikel*
Sheldon E. Richie/Emily J. Seikel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 18th day of May, 2015, a true and correct copy of the foregoing was served as follows:

*Counsel for Appellees*

*For Johnny Wade and Amanda Wade Individually*
Kathryn E. Allen
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2200
Austin, Texas 78701
512-480-5651 Telephone
512-480-5851 Facsimile
kallen@gdhm.com Email

*For Amanda Wade as Independent Executor*
Claude E. Ducloux
Hill, Ducloux, Carnes & De La Garza
400 West 15th Street, Suite 808
Austin, Texas 78701
512-474-7054 Telephone
512-474-5605 Facsimile
cducloux@hdcdlaw.com Email

*/s/ Emily J. Seikel*
Sheldon E. Richie/Emily J. Seikel

# APPENDIX
# INDEX OF RECORD EXHIBITS ACCOMPANYING
# APPELLANT'S BRIEF

**JAMES E. WADE**
*Appellant.*

# TABLE OF CONTENTS
## OF RECORD EXHIBITS ACCOMPANYING
## APPELLANT'S BRIEF

NO.        TITLE OF DOCUMENT

Tab A.     Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims), as modified and entered on April 11, 2014.[142]

Tab B.     Order Denying Plaintiff's Emergency Motion to Reconsider the Court's Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale or, Alternatively, to Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission to Appeal Interlocutory Order, entered on April 29, 2014.[143]

Tab C.     Final Judgment in favor of Appellees based on the Jury Verdict, as modified and entered on November 17, 2014.[144]

Tab D.     Order Denying Plaintiff's Motion for Judgment Notwithstanding the Verdict, as modified and entered on November 17, 2014.[145]

Tab E.     Order Denying Plaintiff's Motion for New Trial, entered on January 26, 2015.[146]

Tab F.     Charge of the Court[147]

Tab G.     Verdict[148]

Tab H.     Modification Agreement[149]

Tab I.     TEX. ESTATES CODE § 752.051

---

[142]    CR:   611.
[143]    CR:   762.
[144]    CR:   1599-1601.
[145]    CR:   1602.
[146]    CR:   1633.
[147]    CR:   1539.
[148]    CR:   1541
[149]    RR:   Vol. 3 of 4 at 6-13

*filed with the Court 4/11/14 @ 2:15 PM W.R.S. Judge*

CASE NO. P9127

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## ORDER GRANTING DEFENDANTS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING THE 2004 SALE (Pertaining to All Claims)

This matter having come before the Court on Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims) *except the 0% interest Note* served March 20, 2014, the Court having considered the submissions of the parties and applicable law, and having heard argument of counsel, FINDS that Defendants' Motion is well taken and should be granted.

IT IS THEREFORE ORDERED that the Amended Motion for Partial Summary Judgment Concerning the 2004 Sale (Pertaining to All Claims) *except the 0% interest Note* be, and hereby is, GRANTED, that Judgment be, and hereby is, rendered in favor of Defendants Johnny Wade and Amanda Wade, and against Plaintiff James Wade on all of his claims against them, and that Plaintiff James Wade take nothing from Defendants Johnny and Amanda Wade.

DATED this __11th__ day of __April__, 2014.

_____
HON. W.R. SAVAGE
PRESIDING JUDGE


FILED THIS __14th__ DAY OF __April__ A.D. 20__14__

*Janet Parker*
COUNTY CLERK, BURNET COUNTY, TEXAS

BY _____ DEPUTY


# EXHIBIT A

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## ORDER

On this 25th day of April, 2014, came on for consideration Plaintiff's Emergency Motion to Reconsider the Court's Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale Or, Alternatively, to Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission to Appeal Interlocutory Order. The Court, having considered the motion, the responses of Defendants, and the argument of counsel, finds that the motion is without merit and should be denied.

IT IS, THEREFORE, ORDERED that Plaintiff's Emergency Motion to Reconsider the Court's Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning the 2004 Sale Or, Alternatively, to Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission to Appeal Interlocutory Order be, and the same is hereby, DENIED.

DATED this 29th day of April, 2014.

_____
HON. W.R. SAVAGE, JUDGE PRESIDING

FILED THIS 29th DAY OF April A.D. 20 14

Janet Parker
COUNTY CLERK, BURNET COUNTY, TEXAS

BY _____ DEPUTY

# EXHIBIT B

**APPROVED AS TO FORM:**

RICHIE & GUERINGER, P.C.
100 Congress Avenue, Suite 1750
Austin, Texas 78701
(512) 236-9220 Telephone
(512) 236-9230 Telecopier

By: _____
Sheldon E. Richie
srichie@rg-austin.com

ATTORNEY FOR JAMES E. WADE

LAW OFFICE OF DON E. WALDEN
7200 North Mopac, Suite 300
Austin, Texas 78731
(512) 349-9595 Telephone
(512) 795-8079 Telecopier

By: _____
Don E. Walden
donwalden@peoplepc.com

ATTORNEY FOR NANCY BURNS

GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 480-5600 Telephone
(512) 480-5851 Telecopier

By: _____
Kathryn E. Allen
State Bar No. 01043100
kallen@gdhm.com
Michelle Alcala
State Bar No. 24040403
malcala@gdhm.com

ATTORNEYS FOR JOHNNY WADE AND AMANDA WADE SOLELY IN THEIR
INDIVIDUAL CAPACITIES

2

HILL DUCLOUX, CARNES & DE LA GARZA
400 W. 15th Street, Suite 808
Austin, Texas 78701
(512) 474-7054 Telephone
(512) 474-5605 Telecopier

By: _____
Claude E. Ducloux
State Bar No. 06157500
cducloux@hdcdlaw.com

ATTORNEY FOR AMANDA WADE IN HER CAPACITY AS EXECUTOR

3

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## FINAL JUDGMENT

On the 29th day of September, 2014, the above entitled and numbered cause was called for jury trial on the remaining claims of James "Bud" Wade, Nancy Burns and Sue Meuth, as Plaintiffs (their claims related to the 2004 sale from Mrs. Wade to Johnny and Amanda Wade having been disposed of by summary judgment dated April 14, 2014) against Johnny Wade and Amanda Wade individually, and Amanda Wade in her capacity as the Independent Executor of this estate, as well as the claims of Johnny Wade and Amanda Wade individually, and Amanda Wade in her capacity as the Independent Executor.

All parties appeared through their respective counsel and announced "ready." A jury of six citizens of Burnet County was selected and sworn, and proceeded to hear the evidence.

At the close of the evidence, the jury was charged by the Court and upon the close of final arguments, took the case under deliberation. On October 6, 2014, the jury delivered its verdict, and found in favor of Johnny Wade and Amanda Wade, in her individual capacity, and in favor of Amanda Wade in her capacity as Independent Executor. The jury further determined the reasonable and necessary attorneys' fees incurred by the Independent Executor through trial and in the event of an appeal. The Court has accepted the jury's verdict, as modified, and it is filed in the papers of this case.

# EXHIBIT C

Final Judgment, Page 1

IT IS, THEREFORE, ORDERED, ADJUDGED AND FINALLY DECREED that the Plaintiffs JAMES E. WADE, NANCY BURNS, and SUE MEUTH take nothing by any of their claims herein.

It is FURTHER ORDERED, ADJUDGED AND FINALLY DECREED that AMANDA WADE shall have and recover from the Estate of Edell Wade the sum of Eighty-Three Thousand and no/100 Dollars US ($83,000.00) for attorneys' fees and expenses through the trial of this case, *plus interest thereon at 5% per annum*

It is FURTHER ORDERED, ADJUDGED AND FINALLY DECREED that AMANDA WADE is hereby conditionally awarded, and shall have and recover from the Estate of Edell Wade in the event an appeal is taken, further attorneys' fees as follows:

a.    $20,000.00 in the event appeal is taken to the Court of Appeals;

b.    $7,500.00 in the event a Petition for Review is filed in the Supreme Court of Texas; and

c.    $10,000.00 in the event of any further proceedings in the Supreme Court.

All costs of court herein incurred are charged against the Plaintiffs.

This is a final judgment, disposing of all claims and all parties. The Clerk shall issue such writs in support of execution as AMANDA WADE may lawfully request.

SIGNED THIS *17* day of November, 2014.

W.R. SAVAGE, Judge Presiding

APPROVED AS TO FORM:

_____

Final Judgment, Page 2

RICHIE & GUERINGER, P.C.

By:    Sheldon E. Richie
       State Bar No. 16877000
100 Congress Avenue, Suite 1750
Austin, Texas 78701
512 236-9220/ 512 236-9230 fax
srichie@rg-austin.com
ATTORNEY FOR JAMES "BUD" WADE

Don E. Walden
LAW OFFICE OF DON E. WALDEN
83 N. Capital of Texas Hwy, Bldg 1, Suite 305
Austin, Texas 78731
(512) 349-9595
(512) 795-8079  Fax
donwalden@peoplepc.com
ATTORNEY FOR NANCY BURNS AND SUE MEUTH


GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 480-5600 Telephone
(512) 480-5851 Telecopier

by: _____
       Kathryn E. Allen
       State Bar No. 01043100
       kallen@gdhm.com
ATTORNEY FOR DEFENDANTS
JOHNNY WADE AND AMANDA WADE

_____
CLAUDE E. DUCLOUX
State Bar No. 06157500
400 W. 15th Street, Suite 808
Austin, Texas 78701
Telephone:  (512) 474-7054
Telecopier:  (512) 474-5605
Email:  cducloux@hdcdlaw.com
ATTORNEY FOR AMANDA WADE,
in her capacity as INDEPENDENT EXECUTOR


Final Judgment, Page 3

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## ORDER DENYING PLAINTIFFS' MOTION
## FOR JUDGMENT NOTWITHSTANDING THE VERDICT

On this _17th_ day of November, 2014, came on to be considered the Plaintiff's Motion for Judgment Notwithstanding the Verdict in the above-styled and numbered cause. The Court has considered the Motion and finds it should be denied.

IT IS THEREFORE ORDERED that the Motion for Judgment Notwithstanding the Verdict of the Plaintiffs, JAMES E. WADE, ~~NANCY BURNS, and SUE MEUTH~~ is hereby Denied. _except as to Attorney_

SIGNED THIS _17th_ day of ~~October~~ _November_, 2014.

_[signature]_

_____
W.R. SAVAGE, Judge Presiding

FILED THIS _17th_ DAY OF _Nov_ A.D. 20_14_

_[signature: Janet Parker]_
COUNTY CLERK, BURNET COUNTY, TEXAS
BY _____ DEPUTY

Order Denying Plaintiff's Motion JNOV, Page 1

**EXHIBIT D**

CAUSE NO.  P9127

| | | |
|---|---|---|
| ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| EDELL WADE, | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

*DENYING*

ORDER ~~GRANTING~~ MOTION FOR NEW TRIAL

ON THIS DAY came to be considered Plaintiff James Wade's Motion for New Trial (the

"Motion").  Having considered the Motion and the argument of counsel the Court ~~finds said~~

*denies the Motion*

~~Motion meritorious.~~

IT IS THEREFORE ORDERED that the Motion for New Trial is ~~GRANTED~~ *DENIED*.

*January 26, 2015*
Date

*[signature]*

The Honorable ~~Judge Randy Savage~~

*Linda Bayless*

FILED THIS 26th DAY OF Jan. A.D. 2015

*[signature] Janet Parker*
COUNTY CLERK, BURNET COUNTY, TEXAS
BY *[signature]* DEPUTY

PLAINTIFF'S MOTION FOR NEW TRIAL                                    - 1 -

# EXHIBIT E

CAUSE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial.

You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge.

In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice, or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court – that is, what you have seen and heard in this courtroom together with the law as given you by the Court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

# EXHIBIT F

1539

6. Unless otherwise instructed, you may answer a question upon the vote of ~~ten~~ 5 or more jurors. If you answer more than one question upon the vote of ~~ten~~ 5 or more jurors, the same group of at least ~~ten~~ 5 of you must agree upon the answers to each of those questions.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless you are otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No."

The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are otherwise instructed.[1]

SIGNED October 6, 2014.

_____
PRESIDING JUDGE

FILED THIS 6th DAY OF Oct A.D. 2014

Janet Parker
COUNTY CLERK, BURNET COUNTY, TEXAS
BY _____ DEPUTY

---

[1] *See* Texas Pattern Jury Charge (Business, Consumer, Insurance, Employment) (2012) ("PJC") 100.3.

2

1540

CAUSE NO. P9127

| ESTATE OF | § | COUNTY COURT AT LAW |
|---|---|---|
| | § | |
| EDELL WADE, | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO. 1

A relationship of trust and confidence existed because Edell Wade justifiably placed trust and confidence in Johnny Wade.

Did Johnny Wade's acceptance of the Modification Agreement comply with his fiduciary duty to Edell Wade?

Because a relationship of trust and confidence existed between them, Johnny Wade owed Edell Wade a fiduciary duty. To prove he complied with his duty, Johnny Wade must show---

a.      the transaction in question was fair and equitable to Edell Wade; and

b.      Johnny Wade made reasonable use of the confidence that Edell Wade placed in him; and

c.      Johnny Wade acted in the utmost good faith and exercised the most scrupulous honesty toward Edell Wade; and

d.      Johnny Wade placed the interests of Edell Wade before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Edell Wade, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary.

You are further instructed that a fiduciary duty owed by one person to another extends only to dealings within the scope of the fiduciary relationship between the parties.

Answer "Yes" or "No".

Answer: _Yes_

**EXHIBIT G**

FILED THIS 16th DAY OF Oct A.D. 2014

Janet Parker
COUNTY CLERK BURNET COUNTY, TEXAS
BY_____ DEPUTY

# CERTIFICATE AS TO JURY QUESTION NO. 1

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____    _____

Barbara Churchwell                                 

Jimmie Sue McKellh

CAUSE NO. P9127

| ESTATE OF | § | COUNTY COURT AT LAW |
| | § | |
| EDELL WADE, | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO. 2

A relationship of trust and confidence existed because Edell Wade justifiably placed trust and confidence in Amanda Wade.

Did Amanda Wade's acceptance of the Modification Agreement comply with her fiduciary duty to Edell Wade?

Because a relationship of trust and confidence existed between them, Amanda Wade owed Edell Wade a fiduciary duty. To prove she complied with her duty, Amanda Wade must show---

a.      the transaction in question was fair and equitable to Edell Wade; and

b.      Amanda Wade made reasonable use of the confidence that Edell Wade placed in her; and

c.      Amanda Wade acted in the utmost good faith and exercised the most scrupulous honesty toward Edell Wade; and

d.      Amanda Wade placed the interests of Edell Wade before her own, did not use the advantage of her position to gain any benefit for herself at the expense of Edell Wade, and did not place herself in any position where her self-interest might conflict with her obligations as a fiduciary.

You are further instructed that a fiduciary duty owed by one person to another extends only to dealings within the scope of the fiduciary relationship between the parties.

Answer "Yes" or "No".

Answer: _Yes_

## CERTIFICATE AS TO JURY QUESTION NO. 2

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)


_____          _____


_____          _____


_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

If you have answered "no" to Question No. 1 or Question No. 2, then answer the following Question. Otherwise, do not answer the following Question.

## QUESTION NO. 3

What sum of money, if paid now in cash, would fairly and reasonably compensate the Estate of Edell Wade for its damages, if any, resulting from either Johnny Wade or Amanda Wade's failure to comply with his/her fiduciary duty to Edell Wade?

The loan modification resulted in a difference, calculated as:

a.      the total amount Johnny and Amanda would have paid Mrs. Wade or her estate under the terms of the February 6, 2004 Promissory Note, had it not been modified, from May 1, 2009 through today; and

b.      the total amount Johnny and Amanda actually paid from ~~May 1, 2009~~ ~~February 6, 2004~~ through today. May 1, 2009

Answer in dollars and cents, if any.

Answer:      $_____

# CERTIFICATE AS TO JURY QUESTION NO. 3

We, the jury, have answered the above and foregoing question as herein indicated, and

herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)


_____          _____


_____          _____


_____

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

Answer the following question only if you answered "No" to Question No. 1 or Question No. 2. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. Otherwise, you must not answer that part of the following question.

## QUESTION NO. 4

Do you find by clear and convincing evidence that the harm to Edell Wade resulted from intentional breach of fiduciary duty or self-dealing ?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No".

Answer: _____

## CERTIFICATE AS TO JURY QUESTION NO. 4

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)


_____          _____


_____          _____


_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

Answer the following question only if you unanimously answered "Yes" to Question No. 4. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION NO. 5

What sum of money, if any, if paid now in cash, should be assessed against Johnny Wade and Amanda Wade and awarded to the Estate of Edell Wade as exemplary damages, if any, for the conduct found in response to Question 4?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of Johnny Wade and Amanda Wade.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of Johnny Wade and Amanda Wade.

Answer in dollars and cents, if any.

Answer: _____

## CERTIFICATE AS TO JURY QUESTION NO. 5

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

## CAUSE NO. P9127

| | | |
|---|---|---|
| **ESTATE OF** | § | **COUNTY COURT AT LAW** |
| | § | |
| **EDELL WADE,** | § | **OF** |
| | § | |
| **DECEASED** | § | **BURNET COUNTY, TEXAS** |

## JURY QUESTION NO. 6

The Court instructs that, if you found that the Modification Agreement was wrongfully procured in breach of fiduciary duty or otherwise, then, for purposes of determination of attorneys' fees, if any, the 2004 Promissory Note is in default and the Plaintiff shall be awarded attorneys' fees. If you found that the Modification Agreement was wrongfully procured, then answer the following question. Otherwise, do not answer the following question.

      1.      What is a reasonable fee for the necessary services of James "Bud" Wade and Nancy Wade Burns' attorneys, stated in dollars and cents?

Answer with an amount for each of the following:

    (1)    For representation in the trial court.

Answer: _____

    (2)    For representation through appeal to the court of appeals.

Answer: _____

    (3)    For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____

    (4)    If accepted, for representation at the merits briefing stage and through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____

# CERTIFICATE AS TO JURY QUESTION NO. 6

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)


_____      _____


_____      _____


_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO 7

Did AMANDA WADE comply with her fiduciary duty in connection with her administration of the Estate of Edell Wade?

In administering the estate, AMANDA WADE owed the beneficiaries of the estate a fiduciary duty. To prove she complied with this duty in connection with Modification Agreement, AMANDA WADE must show that, during her administration of the estate of Edell Wade in question

1.      the administration of the estate was fair and equitable to the beneficiaries, considering AMANDA WADE's obligations in administering the estate; and

2.      AMANDA WADE made reasonable use of the confidence placed in her as the result of her appointment; and

3.      AMANDA WADE acted in the utmost good faith and exercised the most scrupulous honesty toward the beneficiaries in connection with the estate administration in question; and

4.      AMANDA WADE placed the interests of the beneficiaries before her own and did not use the advantage of her position to gain any benefit for herself at the expense of the beneficiaries; and

5.      AMANDA WADE fully and fairly disclosed to the beneficiaries all material facts known to AMANDA WADE concerning the estate in question that might affect the rights of the beneficiaries.

Answer "Yes" or "No."

Answer: __Yes__

## CERTIFICATE AS TO JURY QUESTION NO. 7

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)


_____          _____


_____          _____


_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO. 8

Did Amanda Wade act in good faith, whether successful or not, in defending the action for her removal?

"Good Faith" means an action that is prompted by honesty of intention and a reasonable belief that the action was probably correct?

Answer "Yes" or "No."

ANSWER: _Yes_

## CERTIFICATE AS TO JURY QUESTION NO. 8

We, the jury, have answered the above and foregoing question as herein indicated, and

herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____     _____

_____     _____

_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

If you answered "yes" to Question 8, then answer Question 9. Otherwise, do not answer Question 9.

## QUESTION NO. 9

What sum of money do you find to be the necessary expenses and disbursements, including reasonable attorney's fees, for defending this action for removal?

Answer in dollars and cents for each of the following:

1. For representation in the trial court.

   Answer: $333,000 00

2. For representation through appeal to the court of appeals.

   Answer: $20,000 00

3. For representation at the petition for review stage in the Supreme Court of Texas.

   Answer: $7500 00

4. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

   Answer: $10,000 00

# CERTIFICATE AS TO JURY QUESTION NO. 9

We, the jury, have answered the above and foregoing question herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)


_____          _____


_____          _____


_____

## MODIFICATION AGREEMENT

**Date:** May 1, 2009

**Holder of Note and Lien:** EDELL WADE

**Holder's Mailing Address:**

> 10400 BCR 207
> Lampasas, Texas 76550
> Burnet County

**Obligor:** JOHNNY WADE and AMANDA WADE, husband and wife

**Obligor's Mailing Address:**

> 302 Western
> Lampasas, Texas 76550
> Lampasas County

**Note**

> **Date:** February 6, 2004
>
> **Original principal amount:** $500,000.00
>
> **Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife
>
> **Lender:** EDELL WADE
>
> **Maturity date:** February 1, 2036

**Unpaid Principal and Interest on Note:** $227,528.00

**Lien Documents:** Deed of Trust dated February 6, 2004 from JOHNNY WADE and AMANDA WADE to PAT E. CAVNESS, Trustee, recorded as Document 002424, Volume 1223, page 503, Official Public Records of Burnet County, Texas

**Property (including any improvements):**

> That certain real property in Burnet County, Texas, more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes.

**Extended Maturity Date of Note:** March 1, 2025

**Modified Terms:** The interest rate on this Modification and Extension shall be zero (0%) percent per annum. Principal shall be due and payable in monthly installments of ONE THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($1,200.00) each beginning June 1, 2009 and continuing regularly on the first date of each succeeding month until paid.

**\*THE PARTIES STATE HEREBY THAT THIS MODIFICATION IS FOR THE SOLE PURPOSE OF ELIMINATING THE OBLIGATION OF OBLIGOR TO PAY TO HOLDER INTEREST ON THIS LOAN.\***

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and the Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

I, Janet Parker, County Clerk, Burnet County, Texas do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____



JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell

-1-



EXHIBIT H

When the context requires, singular nouns and pronouns include the plural.

_Edell Wade_
EDELL WADE

_Johnny Wade_
JOHNNY WADE

_Amanda Wade_
AMANDA WADE

STATE OF TEXAS          §

This instrument was acknowledged before me on _June 2_____, 2009, by EDELL WADE.

> BIANE G. VARNER
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. Oct. 20, 2012

_Diane G. Varner_
Notary Public, State of Texas
My commission expires: _10-20-12_____

STATE OF TEXAS          §

This instrument was acknowledged before me on _June 2_____, 2009, by JOHNNY WADE.

> DIANE G. VARNER
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. Oct. 20, 2012

_Diane G. Varner_
Notary Public, State of Texas
My commission expires: _10-20-12_____

STATE OF TEXAS          §

This instrument was acknowledged before me on _June 2_____, 2009, by AMANDA WADE.

> DIANE G. VARNER
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. Oct. 20, 2012

_Diane G. Varner_
Notary Public, State of Texas
My commission expires: _10-20-12_____

PREPARED IN THE OFFICE OF:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6228
FAX: (512) 556-8621

AFTER RECORDING RETURN TO:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6228
FAX: (512) 556-8621

bp/16,163/real/wade

I, Janet Parker, County Clerk, Burnet County, Texas do hereby cerfity that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell



THE STATE OF TEXAS }
COUNTY OF LAMPASAS }     KNOW ALL MEN BY THESE PRESENTS:

That we, Manuel Delbert Sylvester and Chester Horace Sylvester individually and as independent executors of the wills and estates of A. H. Sylvester and wife Emma Sylvester, both deceased, Millie Sylvester wife of Manuel Delbert Sylvester, Melba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin M. Butler Corein Sylvester Stewart and husband Ivan M. Stewart, O. Zell Sylvester ~~~~~~~~~~~~~~~~ in Travis County, Texas, except Chester Horace Sylvester and wife Melba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promisory Vendor's Lien note of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to secure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any lien on the land and premises conveyed hereby except such Vendor's Lien and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

First Tract: West One Quarter of Sec. 60, being one hundred sixty five and 28/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Berry Survey, a set stone from which a L O brs N 9½ E 216½ vrs. a do N 8-3/4 E 219½ vrs. Thence with the N line of the said A. M. Berry Sur. N 71 E 945 vrs st md on the said N line from which the N E cor of the said A. M. Berry Sur. brs N 71 E 5 vrs. The N. E. cor of the said Berry sur. is marked by a st md from which a Large L. O. marked H brs N 42½ W 250 vrs. Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No. 60 on the S line of the Thos. Blair Sur. Thence with the S line of the said Blair Sur. S 71 W 1390 vrs the N E cor of the H. F. Kiszier Sur. St. Md. in S 19 E at 95? vrs a forked Elm the SE cor of the said Kissier Sur., at 1120 vrs. an inner cor of the T. C. R. R. Co. No. 59, for the S. E Cor of this Sur. Thence N 71 E 445 vrs. a st md the Southermost SE cor of this Survey on the W line of the said Berry Sur. Th. N 19 W 660 vrs. to the place of beginning, as Surveyed 1917 by Dan W. Taylor, Jr.

Second Tract: 160 acres of the A. M. Berry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas, this patent is No. 593, Vol. 29, 160 acres, being Survey No. 2489, on the waters of Mesquite Cr at tributary of the Lampasas River, about 15½ miles N 16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

I, Janet Parker, County Clerk, Burnet County, Texas do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _SEP. 23 2014_

JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell



Occupants of Public lands, approved May 26th, 1873. Beginning at at md 582 vrs. N 19 W from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; th N 19 W 950 vrs a st md whence a L O brs N 42½ W 250 vrs a Mesquite brs S½ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9½ E 216½ vrs do brs N 8-3/4 E 219½ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked H.

Third Tract: Out of the Thos. W. Blair Survey, described as given in deed from J. W. Blair and wife to A. M. Blair to Aldge M Berry, dated May 20, 1901, recorded in Deed Records Burnet County, Texas, Vol. 740, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, Texas, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone pile, it being one of the original corners of said original survey from which a Live Oak brs N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak brs N 50 W 75 vrs. Thence N 19 W with George Burtler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm brs S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite brs N 35 W 20 vrs. and Elm brs N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. The S 19 E with the original line 400 vrs to the beginning cor., containing two hundred acres, more or less, SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rook fall in said Mesquite Cr. Thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to R. B. F. Berry by deed dated Sept. 14, 1909, recorded in Vol. 48, pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. W. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, on pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson Now owned by Joe Alexander as the East boundary and the R. B. F. Berry land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less, being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded in Vol. 87 pages 376-81 of the Deed Records of Burnet County, Texas, and which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Butler, Corein Sylvester Stewart, Chester Horace Sylvester, and O. Bell Sylvester Phillips and the grantee Edell Sylvester Wade are collectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

I, Janet Parker, County Clerk, Burnet County, Texas do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on SEP 23 2014

JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell



2 A 5

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular, the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade their heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the Said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Delbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

*Lenora Sylvester Butler*          *Manuel Delbert Sylvester*
                                   Individually and as independent executor of
*Don M. Stewart*                   will of A. H. & Emma Sylvester, both deceased
                                   *Chester Horace Sylvester*
*Corrine Sylvester Stewart*        Individually and as independent executor of
                                   will of A. H. & Emma Sylvester, both deceased
*O. Zell Sylvester Phillips*       *Millie Sylvester*
                                   *Melba Sylvester*
*Gilbert Phillips*                 *Austin M. Butler*

THE STATE OF TEXAS |
COUNTY OF Travis |

Before me, the undersigned authority, a Notary Public in and for Travis County, Texas, on this day personally appeared Manuel Delbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Delbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT                      *J V Hammett*
                                   Notary Public, Travis County, Texas

I, Janet Parker, County Clerk, Burnet County, Texas do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on Sept. 22 2014

JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell

THE STATE OF TEXAS |

COUNTY OF *Lampasas* |

Before me, the undersigned authority, a Notary Public, in and for *Lampasas* County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, *Lampasas* County, Texas

THE STATE OF TEXAS |

COUNTY OF *Lampasas* |

Before me, the undersigned authority, a Notary Public, in and for *Lampasas* County, Texas, on this day personally appeared Manuel Delbert Sylvester, independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, *Lampasas* County, Texas

THE STATE OF TEXAS |

COUNTY OF *Lampasas* |

Before me, the undersigned authority, a Notary Public, in and for *Lampasas* County, Texas, on this day personally appeared Chester Homer Sylvester, individually and as independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, Hamilton County, Texas

I, Janet Parker, County Clerk, Burnet County, Texas do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on Sept. 25, 2014

JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell



I, Janet Parker, County Clerk, Burnet
County, Texas do hereby certify that this is
a true and correct copy as same appears of
record in my office. Witness my hand and
seal of office on _____Sept. 23, 2014

JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell

A
5   5   PAGES

# FILED AND RECORDED

OFFICIAL PUBLIC RECORDS



*Janet Parker*

200905193

June 08, 2009   10:01:48 AM
FEE: $40.00
Janet Parker, County Clerk
Burnet County, Texas

I, Janet Parker, County Clerk, Burnet
County, Texas do hereby cerfity that this is
a true and correct copy as same appears on
record in my office. Witness my hand and
seal of office on _SEPT. 23 2014_


JANET PARKER
BURNET COUNTY CLERK
By Deputy: Jennifer Russell

SUBCHAPTER B.  FORM OF STATUTORY DURABLE POWER OF
ATTORNEY

Sec. 752.051.  FORM.  The following form is known
as a "statutory durable power of attorney":

STATUTORY DURABLE POWER OF ATTORNEY

NOTICE:  THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD
AND SWEEPING. THEY ARE EXPLAINED IN THE DURABLE POWER
OF ATTORNEY ACT, SUBTITLE P, TITLE 2, ESTATES CODE.  IF
YOU HAVE ANY QUESTIONS ABOUT THESE POWERS, OBTAIN
COMPETENT LEGAL ADVICE.  THIS DOCUMENT DOES NOT
AUTHORIZE ANYONE TO MAKE MEDICAL AND OTHER HEALTH-CARE
DECISIONS FOR YOU.  YOU MAY REVOKE THIS POWER OF
ATTORNEY IF YOU LATER WISH TO DO SO.

You should select someone you trust to serve as
your agent (attorney in fact).  Unless you specify
otherwise, generally the agent's (attorney in fact's)
authority will continue until:

(1)  you die or revoke the power of attorney;

(2)  your agent (attorney in fact) resigns or
is unable to act for you; or

(3)  a guardian is appointed for your estate.

I, _____ (insert your name and address),
appoint _____ (insert the name and address of the
person appointed) as my agent (attorney in fact) to act
for me in any lawful way with respect to all of the
following powers that I have initialed below.

TO GRANT ALL OF THE FOLLOWING POWERS, INITIAL THE
LINE IN FRONT OF (N) AND IGNORE THE LINES IN FRONT OF
THE OTHER POWERS LISTED IN (A) THROUGH (M).

TO GRANT A POWER, YOU MUST INITIAL THE LINE IN
FRONT OF THE POWER YOU ARE GRANTING.

TO WITHHOLD A POWER, DO NOT INITIAL THE LINE IN
FRONT OF THE POWER.  YOU MAY, BUT DO NOT NEED TO, CROSS
OUT EACH POWER WITHHELD.

# EXHIBIT I

_____ (A) Real property transactions;

_____ (B) Tangible personal property transactions;

_____ (C) Stock and bond transactions;

_____ (D) Commodity and option transactions;

_____ (E) Banking and other financial institution transactions;

_____ (F) Business operating transactions;

_____ (G) Insurance and annuity transactions;

_____ (H) Estate, trust, and other beneficiary transactions;

_____ (I) Claims and litigation;

_____ (J) Personal and family maintenance;

_____ (K) Benefits from social security, Medicare, Medicaid, or other governmental programs or civil or military service;

_____ (L) Retirement plan transactions;

_____ (M) Tax matters;

_____ (N) ALL OF THE POWERS LISTED IN (A) THROUGH (M). YOU DO NOT HAVE TO INITIAL THE LINE IN FRONT OF ANY OTHER POWER IF YOU INITIAL LINE (N).

SPECIAL INSTRUCTIONS:

Special instructions applicable to gifts (initial in front of the following sentence to have it apply):
_____ I grant my agent (attorney in fact) the power to apply my property to make gifts outright to or for the benefit of a person, including by the exercise of a presently exercisable general power of appointment held by me, except that the amount of a gift to an individual may not exceed the amount of annual exclusions allowed from the federal gift tax for the calendar year of the gift.

ON THE FOLLOWING LINES YOU MAY GIVE SPECIAL INSTRUCTIONS LIMITING OR EXTENDING THE POWERS GRANTED TO YOUR AGENT.

_____

_____
_____
_____
_____
_____
_____

UNLESS YOU DIRECT OTHERWISE ABOVE, THIS POWER OF ATTORNEY IS EFFECTIVE IMMEDIATELY AND WILL CONTINUE UNTIL IT IS REVOKED.

CHOOSE ONE OF THE FOLLOWING ALTERNATIVES BY CROSSING OUT THE ALTERNATIVE NOT CHOSEN:

(A)  This power of attorney is not affected by my subsequent disability or incapacity.

(B)  This power of attorney becomes effective upon my disability or incapacity.

YOU SHOULD CHOOSE ALTERNATIVE (A) IF THIS POWER OF ATTORNEY IS TO BECOME EFFECTIVE ON THE DATE IT IS EXECUTED.

IF NEITHER (A) NOR (B) IS CROSSED OUT, IT WILL BE ASSUMED THAT YOU CHOSE ALTERNATIVE (A).

If Alternative (B) is chosen and a definition of my disability or incapacity is not contained in this power of attorney, I shall be considered disabled or incapacitated for purposes of this power of attorney if a physician certifies in writing at a date later than the date this power of attorney is executed that, based on the physician's medical examination of me, I am mentally incapable of managing my financial affairs.  I authorize the physician who examines me for this purpose to disclose my physical or mental condition to another person for purposes of this power of attorney. A third party who accepts this power of attorney is fully protected from any action taken under this power of attorney that is based on the determination made by a physician of my disability or incapacity.

I agree that any third party who receives a copy of this document may act under it.  Revocation of the durable power of attorney is not effective as to a third party until the third party receives actual notice of the revocation.  I agree to indemnify the third party for any claims that arise against the third party because of reliance on this power of attorney.

If any agent named by me dies, becomes legally disabled, resigns, or refuses to act, I name the following (each to act alone and successively, in the order named) as successor(s) to that agent: _____.

Signed this _____ day of _____, _____

_____
(your signature)

State of _____
County of _____
This document was acknowledged before me on _____(date) by _____ (name of principal)

_____
(signature of notarial officer)
(Seal, if any, of notary)

_____
(printed name)
My commission expires: _____

IMPORTANT INFORMATION FOR AGENT (ATTORNEY IN FACT)

Agent's Duties

When you accept the authority granted under this power of attorney, you establish a "fiduciary"

relationship with the principal.  This is a special legal relationship that imposes on you legal duties that continue until you resign or the power of attorney is terminated or revoked by the principal or by operation of law.  A fiduciary duty generally includes the duty to:

        (1)  act in good faith;

        (2)  do nothing beyond the authority granted in this power of attorney;

        (3)  act loyally for the principal's benefit;

        (4)  avoid conflicts that would impair your ability to act in the principal's best interest; and

        (5)  disclose your identity as an agent or attorney in fact when you act for the principal by writing or printing the name of the principal and signing your own name as "agent" or "attorney in fact" in the following manner:

    (Principal's Name) by (Your Signature) as Agent (or as Attorney in Fact)

    In addition, the Durable Power of Attorney Act (Subtitle P, Title 2, Estates Code) requires you to:

        (1)  maintain records of each action taken or decision made on behalf of the principal;

        (2)  maintain all records until delivered to the principal, released by the principal, or discharged by a court; and

        (3)  if requested by the principal, provide an accounting to the principal that, unless otherwise directed by the principal or otherwise provided in the Special Instructions, must include:

            (A)  the property belonging to the principal that has come to your knowledge or into your possession;

            (B)  each action taken or decision made by you as agent or attorney in fact;

(C)  a complete account of receipts, disbursements, and other actions of you as agent or attorney in fact that includes the source and nature of each receipt, disbursement, or action, with receipts of principal and income shown separately;

(D)  a listing of all property over which you have exercised control that includes an adequate description of each asset and the asset's current value, if known to you;

(E)  the cash balance on hand and the name and location of the depository at which the cash balance is kept;

(F)  each known liability;

(G)  any other information and facts known to you as necessary for a full and definite understanding of the exact condition of the property belonging to the principal; and

(H)  all documentation regarding the principal's property.

Termination of Agent's Authority

You must stop acting on behalf of the principal if you learn of any event that terminates this power of attorney or your authority under this power of attorney.  An event that terminates this power of attorney or your authority to act under this power of attorney includes:

(1)  the principal's death;

(2)  the principal's revocation of this power of attorney or your authority;

(3)  the occurrence of a termination event stated in this power of attorney;

(4)  if you are married to the principal, the dissolution of your marriage by court decree of divorce or annulment;

(5)  the appointment and qualification of a permanent guardian of the principal's estate; or

(6) if ordered by a court, the suspension of this power of attorney on the appointment and qualification of a temporary guardian until the date the term of the temporary guardian expires.
Liability of Agent

The authority granted to you under this power of attorney is specified in the Durable Power of Attorney Act (Subtitle P, Title 2, Estates Code).  If you violate the Durable Power of Attorney Act or act beyond the authority granted, you may be liable for any damages caused by the violation or subject to prosecution for misapplication of property by a fiduciary under Chapter 32 of the Texas Penal Code.

THE ATTORNEY IN FACT OR AGENT, BY ACCEPTING OR ACTING UNDER THE APPOINTMENT, ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT.

Added by Acts 2011, 82nd Leg., R.S., Ch. 823 (H.B. 2759), Sec. 1.01, eff. January 1, 2014.
Amended by:
Acts 2013, 83rd Leg., R.S., Ch. 700 (H.B. 2918), Sec. 1, eff. January 1, 2014.